INTELLECTIVE, INC., Plaintiff,

v.

**MASSACHUSETTS MUTUAL LIFE IN-SURANCE CO., John Hancock Life Insurance Co., f/k/a John Hancock Mutual Life Insurance Co., Principal Life Insurance Co., Times Square Capital Management, Inc., f/k/a Cigna Investments, Inc., Nationwide Mutual Insurance, PricewaterhouseCoopers LLP, and Sagamore Advisors, Defendants.**

No. 01 CIV. 7830(AKH).

United States District Court, S.D. New York.

March 8, 2002.

Jeffrey C. Slade, Slade & Assoc., P.C., New York City, for Plaintiff.

David J. Nathan, New York City, John C. Ohman, Brown, Raysman, Millstein, Felder & Steiner, L.L.P., New York City, for Defendant.

### OPINION AND ORDER DENYING AND GRANTING MOTIONS TO DISMISS

HELLERSTEIN, District Judge.

### BACKGROUND

Plaintiff brings this antitrust action against five major companies in the life insurance industry: Massachusetts Mutual Life Insurance Company, John Hancock Life Insurance Company, Principal Life Insurance Company, Times Square Capital Management, Inc. (f/k/a Cigna Investments, Inc.), and Nationwide Mutual Insurance (collectively, the "Insurance Company Defendants"). Plaintiff also names PricewaterhouseCoopers LLP ("PwC") and Sagamore Advisors ("Sagamore") as defendants.

Plaintiff alleges that the Insurance Company Defendants "have combined in a cartel known as 'the Working Group' to attempt—with the assistance of the other two defendants—to monopolize the market for studies of investment performance by life insurance companies in the United States." Amended Complaint (hereinafter, "Compl.") ¶ 1.

Accepting the allegations in the complaint as true, as I must on a motion to dismiss, the facts of this case are as follows. The Insurance Company Defendants, acting together as the Working Group, have spearheaded, since 1993, an annual study of investment performance in the life insurance industry, the Intercompany Investment Performance Study ("IIPS"). The Working Group collects confidential and proprietary investment performance information from life insurance companies which choose to be part of the study and then provides this data to an independent third party. The third party "vendor" analyzes the data to create the IIPS, which reports on such things as comparative investment management practices, asset allocation strategies, performance and credit quality, investment risk profiles, etc. The IIPS is the only study of investment performance of life insurance companies in the United States.

An insurance company which wants to participate in the IIPS must first sign a "Letter Agreement" with the Working Group. By signing the Letter Agreement, a participant agrees, *inter alia:* (1) that only the Working Group may determine whether any future similar studies are to be performed and make arrangements for such studies; (2) that only the Working Group may use the data, the IIPS and any instrument used in connection with the IIPS for any similar study; (3) that the Working Group owns all copyright in the IIPS and all instruments used in connection with the IIPS; (4) that it will not give the results of the IIPS to any third-party investment managers retained to assist the participant in improving its investment performance, unless the Working Group unanimously agrees; and (5) that any individual company's participation in the IIPS can be terminated upon the unanimous vote of the Working Group. In sum, the terms of the Letter Agreement give the Working Group perpetual control over all participants' historical data. Once a company signs on to participate in the IIPS, that company can never give the same historical investment performance data to any other consultant. In other words, through the Letter Agreement, the Working Group has locked up the information necessary to perform competing studies.

For each of the years 1993 through 1999, the Working Group retained defen-

dant PwC as the third party vendor responsible for analyzing the life insurance companies' data and producing the IIPS. From 1996 through 1999, PwC subcontracted much of this work to plaintiff Intellective Inc. ("Intellective"). Intellective's contract was terminated in 1999 when it, PwC and the Working Group were unable to reach agreement on contract terms for 2000. The Working Group then awarded the contract to defendant Sagamore, but continued to retain PwC to serve as the repository and collection agent for the historical data and the software used to manage and analyze that data.

Plaintiff complains that defendants' control of the investment performance information collected from the various life insurance companies violates federal and state antitrust laws. According to Intellective, the Working Group has prevented the creation of competing studies by using the Letter Agreement permanently to restrict access to data, to coerce other insurance companies not to give investment performance information to any other entity, and to prevent other entities from performing competing studies. Intellective charges that, by using the restrictive Letter Agreement, the Working Group has erected "tremendous barriers of entry for anyone who wishes to compete" because "[a]ny investment performance survey which does not include data from the Working Group companies will be much less valuable than one that does."

Intellective claims that, as a result of the above, it has been injured in its capacity as a potential producer of a competing study. The Working Group's actions have restricted Intellective's ability to obtain the data needed to produce a similar study, thereby either preventing Intellective from producing a competing study at all or causing any study which Intellective could manage to produce to be far less valuable

than it otherwise would have been. Basically, Intellective contends that the activities of the Working Group have prevented Intellective from competing freely and vigorously with the Working Group in the production of investment performance studies of life insurance companies.

Second, Intellective complains that the defendants have refused to deal with Intellective, both by denying it access to the data and by replacing Intellective with Sagamore for the IIPS contract.

Third, Intellective complains that defendants have instigated a suit in New York state court to prevent Intellective from producing a competing study. The state court case alleges that Intellective breached its vendor contract with the Working Group and PwC by retaining data and software after the contract terminated.

Six counts of the Amended Complaint set forth appellants' various theories of antitrust liability. Count One of the Complaint states that the defendants' conduct is an attempt to monopolize in violation of Section 2 of the Sherman Act. Count Two alleges a conspiracy to monopolize, also in violation of Section 2. Count Three states that defendants have engaged in a concerted refusal to deal, in violation of Section 1 of the Sherman Act. Count Four contends that defendants' activities constitute a group boycott, also in violation of Section 1. Count Five alleges illegal "tying" under Section 3 of the Clayton Act. And, finally, Count Six alleges violation of New York's antitrust statute, the Donnelly Act, based on all of the above.

Defendants have moved to dismiss the Amended Complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a legally sufficient claim. One motion was filed by the Insurance Company Defendants, in which defendant Sagamore has joined, and a separate motion was filed by defendant PwC. Defendants offer three arguments for dis-

missal. First, they argue that the Amended Complaint, or at least part of it, should be dismissed under the *Noerr–Pennington* Doctrine. Second, they argue that Intellective lacks "antitrust standing" because the Amended Complaint fails to allege either (1) an adequate relevant product market or (2) "antitrust injury." Third, they argue that Intellective has failed to plead facts adequate to satisfy certain elements of the violations claimed.

The motions to dismiss defendants PwC and Sagamore from the case are granted. Intellective has not alleged anti-competitive conduct on the part of either of these entities. The motion of the Insurance Company Defendants is denied. At this early stage of the proceedings, Intellective has satisfied the pleading requirements to make out an antitrust action against these entities.

## DISCUSSION

On a motion to dismiss for failure to state a claim, I must accept the complaint's allegations as true and read them in the light most favorable to the plaintiff. *Todd v. Exxon Corp. et al.*, 275 F.3d 191, 197 (2d Cir.2001). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). "The issue is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

■■ In antitrust cases, as in all federal cases, only "a short plain statement of a claim for relief which gives notice to the opposing party" is required of the complaint. *George C. Frey Ready–Mixed*

*Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 554 (2d Cir.1977). However, it is improper to assume that "the defendants have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors of California, Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Nonetheless, the Supreme Court has warned that in antitrust cases "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).

## I. *Noerr–Pennington* Doctrine

■■ The *Noerr–Pennington* Doctrine, wholly created by case law, is a limitation upon the scope of the Sherman Act, and provides that the Act does not apply to joint efforts by competitors to petition the government. First established in the context of concerted petitions for anti-competitive legislation, *see Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the doctrine has been held to cover court petitions (i.e., lawsuits) as well. *See Bill Johnson's Restaurants v. NLRB*, 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) ("The right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances. Accordingly, we construe[ ] the antitrust laws as not prohibiting the filing of a lawsuit, regardless of the plaintiff's anticompetitive intent or purpose in doing so, unless the suit was a 'mere sham' filed for harassment purposes.") (citing *California Motor Transport Co. v. Truck-*

*ing Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972)).

Defendants argue that Intellective's complaint should be dismissed because "the central allegation" in the Complaint relates to a lawsuit filed by the Insurance Company Defendants and PwC. The Amended Complaint alleges that, after Intellective announced its intention to conduct an IIPS-like study, the Working Group and PwC, "with the specific intent of maintaining the Working Group's monopoly ..., immediately took steps to keep Intellective from competing with the Working Group and its new agent Sagamore." Compl. ¶ 25. Only one of these "steps" is alleged in the Amended Complaint: the commencement by the Insurance Company Defendants and PwC of an action against Intellective in the New York State Supreme Court to prevent Intellective from using either the historical information that had been developed in past studies or the software that Intellective had developed and had used in connection with these studies. Compl. ¶ 26.

To the extent Intellective's Complaint alleges a violation of antitrust laws based on the Working Group and PwC's filing of a suit against Intellective, the *Noerr–Pennington* Doctrine is squarely applicable. Although the Amended Complaint does not explain the basis for the state court claim, the Working Group and PwC filed the suit to enforce the terms of the contracts that governed Intellective's performance of the IIPS from 1996 to 1999.[1] Such activity does not violate the antitrust laws under *Noerr–Pennington. Bill Johnson's Restaurants,* 461 U.S. at 741, 103 S.Ct. 2161; *California Motor Transport,* 404 U.S. at 510, 92 S.Ct. 609.

■ Moreover, the "sham" exception of *Noerr–Pennington* does not apply. *See Eastern Railroad Presidents Conference,* 365 U.S. at 144, 81 S.Ct. 523 (where petitioning activity "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor[, ...] the application of the Sherman Act is justified"); *see also California Motor Transport,* 404 U.S. at 513, 92 S.Ct. 609. The "sham" exception arises only where (1) the lawsuit is "objectively baseless" and (2) the subjective intent of the antitrust defendants is to interfere with a competitor's business by the mere invocation of the governmental process rather than the outcome of that process. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries,* 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). The Working Group and PwC's lawsuit was based on breach of contract and was not objectively baseless; nor is there any allegation that the antitrust defendants were exploiting a governmental process merely to interfere with Intellective's business.[2]

---

1. The Insurance Company Defendants' motion papers attached a copy of the complaint in the New York State Court case, and I am entitled to take judicial notice of it. Fed. R.Evid. 201; *see, e.g., Hill v. Goord,* 63 F.Supp.2d 254, 256 (E.D.N.Y.1999) ("It ... is entirely proper for this Court to take judicial notice of the actions taken in ... related [state court] proceedings 'to establish the fact of such litigation and related filings.'") (quoting *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir. 1992)).

2. By letter to the Court, Intellective expressed a desire to amend the complaint to assert facts sufficient to support a claim for sham litigation. Intellective contends that it was not able to assert such facts earlier because the state court proceeding was still in its infancy when Intellective filed its federal complaint. At that time, the state court plaintiffs (defendants here) had succeeded in obtaining an *ex parte* Temporary Restraining Order against Intellective, but the state court had not yet rendered a decision on their application for Preliminary Injunction. However, it

## II. Antitrust Standing

The Clayton Act, 15 U.S.C. § 12 *et seq.*, permits private parties to institute actions under the federal antitrust laws. *See* 15 U.S.C. § 15 ("Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . ., and shall recover threefold the damages by him sustained."); 15 U.S.C. § 26 ("Any person . . . shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws.").

█ Although these laws specify that "any person" may sue, the courts have outlined three standing requirements for would-be antitrust plaintiffs. First, the plaintiff must allege a relevant product market. *International Audiotext Network, Inc. v. American Tel. & Tel. Co.*, 893 F.Supp. 1207, 1211 (S.D.N.Y.1994), *aff'd* 62 F.3d 69 (2d Cir.1995). Second, the plaintiff must allege conduct in violation of the antitrust laws. *Id.* Finally, the plaintiff must allege an "antitrust injury," that is, an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Defendants contend that Intellective does not have antitrust standing because it has failed to allege either a relevant product market or an antitrust injury.

## A. Relevant Product Market

█ In order to have antitrust standing, Intellective must identify the relevant product market which defendants' antitrust activities are alleged to have affected. Intellective alleges that the relevant market in this case is "the market for studies of the investment performance of life-insurance companies in the United States." Compl. ¶ 1.

█ To survive a motion to dismiss, the alleged product market must (1) "include all products reasonably interchangeable, determination of which requires consideration of cross-elasticity of demand," *Re–Alco Industries, Inc. v. National Center for Health Education, Inc.*, 812 F.Supp. 387, 391 (S.D.N.Y.1993); and (2) be plausible, *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir.2000), *cert. denied,* —— U.S. ——, 122 S.Ct. 201, 151 L.Ed.2d 142 (2001). *See also Todd,* 275 F.3d at 200. The purpose of the relevant market inquiry is to ensure that the plaintiff has not been overly restrictive in his or her allegations of the relevant market in order to create an unwarranted "appearance" of antitrust injury. *Smalley & Co. v. Emerson & Cuming, Inc.*, 808 F.Supp. 1503, 1512 (D.Colo.1992) ("Plaintiff cannot artificially create antitrust claims by narrowly defining the market to create the appearance of an antitrust injury."), *aff'd* 13 F.3d 366 (10th Cir.1993).

█ In the context of a Rule 12(b)(6) motion to dismiss, the complaint must either allege facts regarding substitute products, distinguish among comparable products, or allege facts relating to cross-elasticity of demand; otherwise, dismissal is appropriate. *Re–Alco Industries,* 812 F.Supp. at 391; *Queen City Pizza, Inc. v.*

is clear that the state court proceeding is not a sham. Although the state court eventually decided against granting an injunction on the software portion of the complaint, the fact that a state court granted a TRO and then a partial preliminary injunction precludes a finding that the litigation was "objectively baseless." *See, e.g., Omni Resource Development Corp. v. Conoco, Inc.*, 739 F.2d 1412 (9th Cir.1984) (grant of preliminary injunction precluded finding of sham).

*Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir.1997). And, of course, the plaintiff's allegations of substitute and comparable products and cross-elasticity of demand must also be plausible. *Hack,* 237 F.3d at 86. However, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd,* 275 F.3d at 199–200.

■■■■■ "Interchangeability" and "cross-elasticity of demand" are the critical components of a relevant product market. "Interchangeability" looks to the use or function of the given product as compared to other products. Every product that can be substituted for the same use or purpose should be included within a single product market. "Cross-elasticity" is related to interchangeability, and requires a consideration of the extent to which a change in the price of one product will alter demand for another product. If a slight change in the price of one will significantly affect demand for the other, then the products are at least somewhat interchangeable and should be included in the same product market.

Intellective alleges that its market definition, though inclusive of only one product, is complete because "there is no viable alternative to a study or studies based on actual performance data from other life-insurance companies." Compl. ¶ 17. Intellective contends that studies of investment performance in other industries, including non-life insurance industries, provide "meaningless" comparisons. *Id.* Intellective also alleges that studies based on publicly available information would be equally meaningless.

Intellective supports these statements by alleging that the life-insurance industry is different from other insurance industries. According to the Amended Complaint, the life-insurance industry is gov-

erned by "different rules ... which create different investment requirements and challenges." *Id.* For example, investment activity in the life-insurance industry is more highly regulated, with "unique rules restricting certain investment activities, the nature of exposures, as well as asset quality and liquidity guidelines." *Id.* "Life insurers are also faced with unique capital, disclosure and reporting requirements," and need to manage their assets so that their cash flow coincides with obligations to life insurance policyholders and beneficiaries. *Id.* Additionally, life Insurance companies are less focused on tax implications for investments than are property and casualty insurers. *Id.* Intellective alleges that these various factors make the life-insurance industry unique, and that therefore a study of investment performance of life-insurance companies is not interchangeable with studies of investment performance of any other industry. Moreover, there are no substitutes for an IIPS-like study, according to plaintiff, because "[p]ublicly available investment information for the life-insurance industry ... is based on limited, accounting-based standards that neither relate the risk characteristics of assets to expected return nor provide management with signals of either impending danger or emerging opportunities." *Id.*

Intellective contends that it has satisfied the pleading requirements in its allegations concerning the relevant market and that any further analysis of the relevant market is for the trier of fact, not for the judge on a motion to dismiss. *See Fineman v. Armstrong World Industries, Inc.,* 980 F.2d 171, 199 (3d Cir.1992) ("The determination of a relevant product market or submarket ... is a highly factual one best allocated to the trier of fact."); *see also Brown Shoe Co. v. U.S.,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)

("The boundaries of [a relevant product market] may be determined by examining [ ] practical indicia."); *Bogan v. Hodgkins*, 166 F.3d 509, 516 (2d Cir.) (defining a market is a "fact-driven inquiry" into "practical indicia."), *cert. denied*, 528 U.S. 1019, 120 S.Ct. 526, 145 L.Ed.2d 407 (1999).

Defendants argue that Intellective has not satisfied its pleading requirement for two reasons. First, defendants contend that Intellective has alleged a market that is so narrow as to fall within the "strange red-haired, bearded, one-eyed man-with-a-limp classification" rejected by courts as a matter of law. *See Belfiore v. The New York Times Co.*, 654 F.Supp. 842, 846 (D.Conn.1986), *aff'd*, 826 F.2d 177 (2d Cir. 1987) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 457 n. 4 (2d Cir.1974)). In support of its argument, defendants rely primarily on cases such as *Re–Alco* and *Queen City Pizza*, in which the complaints were dismissed because the plaintiffs had attempted to limit the product market to a particular brand. This case, however, does not present the "one brand" problem, and is not dismissible on this ground.

Defendants' second challenge to the relevant product market as alleged by Intellective is that the market fails to consider both sides of the equation. Defendants contend that while Intellective may have alleged facts sufficient to satisfy the pleading requirement on the "demand" side, it has failed to allege facts sufficient to satisfy the pleading requirement as to the "supply" side. Defendants rely for this argument on cases like *Blue Cross & Blue Shield of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir.1995), which states that "the definition of a market depends on substitutability on the supply side as well as on the demand side." *Id.* at 1410–11.

Through this argument, defendants raise an interesting issue: what is the correct perspective from which to define and analyze the market? Intellective defines the relevant market from what I will term the "consumer's viewpoint," in which the market is defined as the product being consumed—here, the investment performance study. Intellective has satisfied the pleading requirement in regard to this market because it has advanced, on the surface, plausible reasons why this market is unique unto itself and has discussed the lack of interchangeable products. Defendants contend, however, that the analysis of relevant market must also consider the "supplier's viewpoint," in which the market is defined as the *production* of investment performance studies. Defendants argue that viewed from the perspective of suppliers like Intellective, the market cannot be confined to the production of investment performance studies of life insurance companies; instead, it must include also the other services a company like Intellective could provide. Defendants contend, for example, that a company like Intellective could perform the same type of investment-analysis services "to hundreds of disability, property, casualty and long-term care insurers, or to firms that sell annuities, or to banks, or other financial institutions ... [all of which] invest funds, strive to improve their investment performance and seek comparative measures in order to evaluate that performance."

The cases cited by defendants to support this argument use the concept of "substitutability of supply" differently than the way that defendants apply it here. Substitutability of supply, as used in defendants' cited cases, refers to substitutability of suppliers *of a given product*. For example, in *Santa Cruz Med. Clinic v. Dominican Santa Cruz Hospital*, 1995 WL 853037 (N.D.Cal. Sept.7, 1995), one of the three cases cited by defendants, the Northern

District of California court was careful to state that "in assessing a possible product market ... the focus is on the substitutability of *alternative [products] that are competitive with [the product at issue]." Id.* at *13 n. 3 (emphasis added). As to the *products*, the court divides the relevant inquiry into "demand substitution" and "supply substitution." "Demand substitution" exists if a consumer can turn to a different product or service to satisfy its need—i.e., if the customer has a choice of products. *Id.* "Supply substitution" exists if suppliers of other products or services could easily modify their activities to provide the product or service at issue—i.e., if the customer has a choice of suppliers. *Id.* The other two cases cited by defendants, *Blue Cross & Blue Shield* and *Traffic Scan Network, Inc. v. Winston*, 1995 WL 317307 (E.D.La. May 24, 1995), assess the supplier substitutability in the same manner. The focus is always on the product itself, and the ability of the consumer of that product to choose either a different product or a different supplier for that product. The focus is not, as defendants try to argue, on what any given supplier may be able to produce. The "supply substitution" question is relevant where the existence of only one supplier is not due to any monopolistic actions on the part of that supplier, but rather is due to other potential suppliers' lack of interest in entering the market for the product at issue.

Intellective defined the relevant market in terms limited to the product itself—a study of investment performance of life insurance companies—and not on the companies capable of engaging such a study, and in like studies, for any number of investment companies. This case presents an unusual product and an unusual market, not easily susceptible to supply- or demand-side analysis. The data upon which the Working Group's investment analysis is made is valuable only because it reflects a composite of insurance companies. That value would be lost if each company would be restricted to its own data in seeking investment analysis. Thus, it is hard to pin the epithet of "monopolists" on the members of the Working Group for having undertaken the process of collecting the data, because without collection there would be no value and no product.

As defendants do, I question if a particular category of investment analysis can be defined as its own market. After the fruits of the parties' discovery and economic analyses are presented to me at a later stage, I may not have to accept Intellective's market definition as valid. But we have not yet reached that point. Therefore, while I believe that Intellective will have a difficult time proving that its market definition is appropriate, Intellective has satisfied the pleading requirement as to relevant product market, and I cannot dismiss the complaint on this basis at this time.

## B. Antitrust Injury

Defendants also move to dismiss for lack of standing because plaintiff fails adequately to plead an "antitrust injury." An antitrust injury is defined as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp.*, 429 U.S. at 489, 97 S.Ct. 690. To state an antitrust injury, a plaintiff must demonstrate that defendants' conduct "has had an actual adverse affect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Capital Imaging v. Mohawk Valley Med. Assoc.*, 996 F.2d 537, 543 (2d Cir.1993); *see also Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)

("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior."). This is because "[t]he antitrust laws ... were enacted for 'the protection of competition, not competitors.'" *Brunswick Corp.*, 429 U.S. at 488, 97 S.Ct. 690 (quoting *Brown Shoe*, 370 U.S. at 320 82 S.Ct. 1502). However, the plaintiff must still show that *it* specifically was injured by the particular aspect of the defendants' conduct that has adversely affected marketwide competition. *See Atlantic Richfield*, 495 U.S. at 344–46, 110 S.Ct. 1884.

■ Defendants argue that Intellective has alleged only a harm to itself, not a harm to the entire market. Defendants focus on Intellective's allegation that the Working Group replaced it with Sagamore to produce the IIPS, and cite numerous cases holding that the loss of a contract is not actionable under the antitrust laws. *See, e.g., NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) ("[T]he freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage."); *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 45 (7th Cir.1996) ("[C]ompetition-for-the-contract is a form of competition that the antitrust laws protect rather than proscribe.").

To the extent Intellective claims injury relating to its loss of the IIPS contract, defendants are correct that Intellective has not pleaded an adequate antitrust injury. Intellective lost the IIPS contract to Sagamore through competition between the two. "[I]t is the nature of competition that at some point there are winners and losers, and the losers are excluded.'" *Balaklaw v. Lovell*, 14 F.3d 793, 801 (2d Cir.1994) (quoting *Konik v. Champlain Valley Physicians Hosp. Medical Center*, 733 F.2d 1007, 1015 (2d Cir.1984)). Here, just as in *Balaklaw*, Intellective entered a competition for an exclusive contract and it lost. This is an injury only to Intellective, and not to the relevant market—and it is only the latter type of injury which the antitrust laws proscribe.

However, Defendants mistake Intellective's primary complaint.[3] Although Intellective does complain of the Insurance Company Defendants' decision not to award the contract to Intellective, Intellective's principal claim stems from the Working Group's attempt to monopolize the information necessary to compete in the relevant market. Intellective adequately states an antitrust injury in this regard. Intellective alleges that it, and all others, are prevented from competing in the relevant market by the Working Group's control of the data necessary to perform a competing study. The prevention of this type of marketwide competition is an "injury of the type the antitrust laws were designed to prevent." *Brunswick Corp.*, 429 U.S. at 489, 97 S.Ct. 690. Further, Intellective's own injury—its inability to compete in this market—stems from defendants' activities, as required under *Atlantic Richfield*.

Of course, one might suppose that a consortium of insurance companies could collect data from each member in order to

---

**3.** Defendant's mistake is easy to understand, as the Amended Complaint is not a model in clarity. Intellective causes confusion by hinting at antitrust injuries of which it cannot complaint. For example, is Intellective complaining about loss of competition among insurance companies? *See* Compl. ¶ 31. Intellective lacks standing to premise any claim on this alleged antitrust injury, as Intellective is not an insurance company. Is Intellective complaining about loss of competition among investment analysts? If so, its complaint would not be plausible, for there are innumerable outlets for investment analysis.

enable a comparative analysis without also preventing the members from supplying their individual data to a different consortium or independent analyst. If that were the case here, Intellective could not complain about anticompetitive activity because Intellective would not have been shut out of the market. But on the facts alleged, Intellective has adequately alleged an antitrust injury, and its complaint cannot be dismissed on this ground at this time.

## III. Violation of the Antitrust Laws

The Amended Complaint contains six causes of action. To avoid dismissal of any one of these causes of action, Intellective must allege facts supporting each element of the given violation. Defendants argue that Intellective has failed to do so for certain elements.

### A. Counts One and Two: Attempt to Monopolize and Conspiracy to Monopolize

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. In order to state a claim for an attempt to monopolize and/or conspiracy to monopolize in violation of this section, Intellective must allege (1) predatory or anticompetitive conduct; (2) specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *see also Volvo North America Corp. v. Men's*

*International Professional Tennis Council*, 857 F.2d 55, 73–74 (2d Cir.1988). To determine whether there is a dangerous probability of monopolization, courts consider " 'the defendant's ability to lessen or destroy competition' " in the relevant market. *Spectrum Sports*, 506 U.S. at 456, 113 S.Ct. 884 (quoting *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965)).

Here, Intellective has alleged the necessary elements of an unlawful attempt and/or conspiracy to monopolize, at least as to the Insurance Company Defendants. Intellective alleges that, by requiring companies participating in the study to sign the restrictive Letter Agreement giving the Working Group exclusive and permanent control over historical and current data, the Working Group has engaged in anticompetitive conduct. *See* Compl. ¶¶ 18–19, 30. Intellective also alleges that the Working Group acted with specific intent to monopolize. *See* Compl. ¶ 25. Finally, Intellective alleges facts showing that there was a dangerous probability that the Working Group would achieve monopoly power by alleging that the Working Group *had actually achieved* monopoly power. *See* Compl. ¶¶ 19, 20. Intellective also alleges that the Working Group was likely to be able to lessen or destroy competition: the Working Group companies hold over 15% of the assets of the entire industry; the Working Group companies hold over 20% of the total managed invested assets of the major insurance companies; and they are recognized as leaders in the industry and have high name recognition. Compl. ¶ 29.[4] Resolu-

---

4. Defendants contend that 15% or even 20% is too small a share as a matter of law to enable the Insurance Company Defendants to raise the overall market price or restrict the overall output. Cases cited by defendants in-

clude such language as, "[f]ifty percent is below any accepted benchmark for inferring monopoly power from market share." *Blue Cross & Blue Shield*, 65 F.3d at 1411. The cases cited by defendants concern whether a

tion of whether or not Intellective's allegations will be borne out by the facts is an inquiry I cannot now undertake. I hold only that Intellective's attempt and/or conspiracy to monopolize claims must await further factual development and can not be dismissed.

The Insurance Company Defendants argue that they are the *consumers*, not the *sellers*, in this market, and therefore cannot be held liable for either attempt or conspiracy to monopolize. *See Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508, 513 (3d Cir.1994). However, it is clear from the Complaint that the Insurance Company Defendants are both suppliers and purchasers of the investment study. They are suppliers because they gather the data necessary, use a third party to analyze the data, and then sell the packaged analysis—the IIPS—to life insurance companies. They are purchasers because, as individual life insurance companies, each also purchases the packaged analysis. As suppliers, the Insurance Company Defendants would in fact be in a position to attempt and/or to conspire to wield monopoly power.

██ What is not clear from the Amended Complaint is how the non-insurance company defendants, PwC and Sagamore, were engaged in the alleged attempt to monopolize. The Complaint states that PwC and Sagamore were involved in the attempt to monopolize as the Working Group's "agents." However, no allegations in the Complaint state that either PwC or Sagamore engaged in any uncompetitive activity. Sagamore merely won the contract to perform the IIPS study. This is not anticompetitive activity, as ex-

plained in Section II. PwC may have continued to assist in the production of the IIPS contract, but likewise did not thereby engage in anticompetitive activity. The only other action by PwC alleged to be anticompetitive—the instigation, with the Working Group, of a state court preceding against Intellective—cannot form the basis for a Sherman Act violation due to the *Noerr–Pennington* Doctrine, as discussed in Section I. Counts One and Two must be dismissed against both PwC and Sagamore because Intellective has failed to allege unlawful anticompetitive activity by either of these entities.

**B. Counts Three and Four: Concerted Refusal to Deal and Group Boycott**

██ Intellective claims that defendants committed *per se* violations of Section 1 of the Sherman Act by having engaged in a "concerted refusal to deal" and a "group boycott." Sherman Act § 1 prohibits "[e]very contract, combination ... or conspiracy in restraint of trade or commerce." 15 U.S.C. § 1. As Section 1's language is "broad enough to render illegal nearly all commercial understandings," the Supreme Court established a "rule of reason" analysis to guide courts in determining what is proscribed commercial activity. *See Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C.Cir.1978). Under the rule of reason analysis, the factfinder determines whether a practice imposes an unreasonable restraint on competition by examining and weighing all the facts and circumstances of the case. To avoid this laborious process in cases of obviously unreasonable restraints, courts have identified certain types of agree-

---

monopoly can be inferred from market share alone. Intellective is not arguing that the existence of a monopoly should be inferred from the Working Group's percentage control of the life insurance industry. Rather, Intel-

lective argues that by acting together, the Working Group members possess a significant market share such that they can influence and control other companies who are acting alone.

ments deemed to be illegal *per se*. Among these *per se* illegal activities are certain "concerted refusals to deal" and "group boycotts," both of which are claimed by Intellective. In Count Three, Intellective alleges that the Insurance Group Defendants "agreed to work together in refusing to deal with Intellective" and thereby engaged in a "concerted refusal to deal" with Intellective. Compl. ¶¶ 41–43. Separately Intellective alleges in Count Four that all the defendants engaged in a "group boycott" by "act[ing] in concert to prevent Intellective—or any other potential competitor—from obtaining access to historical information."

■ Although Intellective separates its allegations of "concerted refusal to deal" and "group boycott," the two are analytically identical. "The classic 'group boycott' is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." *Smith*, 593 F.2d at 1178. Protection from outside competition is usually achieved through depriving the would-be competitor from something necessary to enter or survive in the market. However, not all group boycotts are so inherently anticompetitive as to be *per se* illegal. The Supreme Court limited the universe of *per se* illegal group boycotts in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). The Supreme Court held that *per se* cases are those in which "the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote." *Id.* at 294, 105 S.Ct. 2613. Such cases typically involve the following: (1) joint efforts by a firm or firms either to deny directly, or to persuade or coerce suppliers or customers, to deny relationships and/or access to supplies, facili-

ties, or markets needed by would-be competitors; (2) the boycotting firms are dominant in the relevant market; and (3) "the practices [are] generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." *Id.* (holding that a purchasing cooperative's expulsion of a member without any notice or hearing is not a *per se* illegal group boycott and instead must be analyzed under the rule of reason).

■ To the extent Intellective complains of the restraints placed by the Working Group on historical investment performance information, it has satisfied the pleading requirements for a group boycott. Intellective alleges that five life insurance companies have banded together to control all historical information necessary for any other entity to compete in the relevant market. Compl. ¶¶ 18–19. Intellective also alleges that these five companies are dominant in the life insurance industry. Compl. ¶ 29. The clear inference from Intellective's pleadings is that the Working Group's activities completely precluded competition and had no plausible pro-competitive justification.

However, as with Counts One and Two, there are insufficient allegations to support a group boycott claim against either PwC or Sagamore. Count Four is therefore dismissed against these entities.

■ Count Three, on the other hand, must be dismissed against all defendants. In Count Three, Intellective alleges a concerted refusal to deal but does not specify what activities exemplify the violation. The Complaint provides only two possibilities. One allegation in the Complaint of a concerted refusal to deal is the Working Group's refusal to share data with Intellective. Using this allegation as the basis for Count Three would make it repetitive of Count Four. The only other allegation sup-

porting a "concerted refusal to deal" is the Working Group's decision not to award the IIPS contract to Intellective. As discussed above, this decision did not result in an antitrust injury, and therefore cannot be used to support a "concerted refusal to deal" claim. Since there is no viable allegation of activity to support Count Three, this count must be dismissed.

## C. Count Five: Tying

 Intellective's final federal claim is illegal "tying" in violation of Section 3 of the Clayton Act which makes it unlawful to "make a sale or contract for sale of goods ... on the condition, agreement, or understanding that the ... purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the ... seller, where the effect ... may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14. Simplified, "[a] tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchase[ ] a different (or tied) product." *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted).

In order to state a claim for tying in violation of the Clayton Act, Intellective must allege (1) a tying product; (2) a tied product; (3) evidence of actual coercion by the seller that forced the buyer to accept the tied product; (4) sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; (5) anticompetitive effects in the tied market; and (6) involvement of a "not insubstantial" amount of interstate commerce in the tied market. *Hack*, 237 F.3d at 86 (quoting *Gonzalez v. St. Margaret's House Housing Development Fund Corp.*, 880 F.2d 1514, 1516–17 (2d Cir.1989)).

Intellective alleges that "[t]he Working Group, which has substantial market pow-er through its asserted use of historical investment performance information (the tying product), is attempting to use that power to force insurance companies to use the services of its agent, Sagamore, to perform the their investment performance studies (the tied product)." Compl. ¶ 50. This formulation does not make sense; the "tied product" is actually Sagamore's services, not the investment performance study. Either way, Intellective has not stated a cause of action for tying. The antitrust injury resulting from the Working Group's alleged anticompetitive control of the historical investment performance data is the monopolization of supply that creates an insurmountable barrier to entry, an injury accounted for in Counts One, Two and Four.

## D. Count Six: Donnelly Act Violations

 Intellective's final cause of action arises under the Donnelly Act, New York's antitrust law. The Donnelly Act was modeled after the Sherman Act, and the courts generally apply federal antitrust precedent in construing it. *Re–Alco*, 812 F.Supp. at 393. Intellective's Donnelly Act claim therefore cannot be dismissed to the extent Intellective still has viable Sherman Act claims.

## SUMMARY

For the reasons stated above, I dismiss Counts Three and Five of the Amended Complaint as against all defendants. I also dismiss the remainder of the Amended Complaint as against defendants PwC and Sagamore. The Clerk of Court is directed to remove their names from the caption.

SO ORDERED.