**Maurice CLARETT, Plaintiff,**

v.

**NATIONAL FOOTBALL LEAGUE, Defendant.**

No. 03 Civ. 7441(SAS).

United States District Court, S.D. New York.

Feb. 5, 2004.

Alan C. Milstein, Jeffrey P. Resnick, Sherman, Silverstein, Kohl, Rose & Podolsky, Pennsauken, New Jersey, John B. Langel, Burt M. Rublin, Amy L. Weiss, Ballard, Spahr, Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania, Robert A. Skirnick, Daniel B. Allanoff, Meredith, Cohen, Greenfogel & Skirnick, New York City, Prof. Robert A. McCormick, Michigan State University, Detroit College of Law, East Lansing, Michigan, for Plaintiff.

Gregg H. Levy, Joshua D. Wolson, James M. Garland, Benjamin C. Block, Covington & Burling, Washington, D.C., Jessica L. Malman, Covington & Burling, New York City, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

### I. INTRODUCTION

Maurice Clarett's goal is to play in the National Football League next year. The only thing preventing him from achieving that goal is the League's rule limiting eligibility to players three seasons removed from their high school graduation. The question before the Court is whether this Rule violates the antitrust laws.

Clarett, a star freshman football player attending The Ohio State University, now in his sophomore year, challenges the Rule, claiming that he is ready, willing and able to play in the NFL and that his exclusion violates the antitrust laws. Clarett's challenge to the Rule raises serious questions arising at the intersection of labor law and antitrust law, not to mention the intersection of college football and professional football. Should Clarett's right to compete for a job in the NFL—the only serious pro football game in town—trump the NFL's right to categorically exclude a class of players that the League has decided is not yet ready to play?

The answer requires the Court to tackle a number of technical legal issues. The NFL defends itself by asserting three arguments: (1) the Rule is the result of a collective bargaining agreement between the NFL and the players union and is therefore immune from antitrust scrutiny; (2) Clarett has no standing under the antitrust laws to bring this suit; and (3) the Rule is reasonable.

■ While, ordinarily, the best offense is a good defense, none of *these* defenses hold the line. Because the Rule does not concern a mandatory subject of collective bargaining (wages, hours and conditions of employment), governs only non-employees, and did not clearly result from arm's length negotiations, it is not immune from antitrust scrutiny. Clarett has standing to sue because his injury flows from a policy that excludes all players in his position from selling their services to the only viable buyer—the NFL. Finally, the NFL has not justified Clarett's exclusion by demonstrating that the Rule enhances competition. Indeed, Clarett has alleged the very type of injury—a complete bar to entry into the market for his services—that the antitrust laws are designed to prevent. It is axiomatic, in the words of Learned Hand, that the antitrust laws will not tolerate a contract "which unreasonably forbids any one to practice his calling." [1]

Because the NFL cannot prevail on any of these defenses, the Rule must be sacked.

### II. UNDISPUTED FACTS AND PROCEDURAL POSTURE

The facts of this dispute are easily recounted and essentially undisputed, unless otherwise noted. Clarett, a college football player, is suing the NFL under the Sherman Antitrust Act,[2] asserting that the League's Rule limiting eligibility for the draft to players three seasons removed from their high school graduation constitutes an unreasonable restraint of trade.

#### A. The NFL and the Collective Bargaining Agreement

The NFL began operating in 1920 as the American Professional Football Association, comprised of twenty-three member clubs.[3] The current NFL is an unincorporated association of thirty-two member

---

1. *Gardella v. Chandler,* 172 F.2d 402, 408 (2d Cir.1949).

2. 15 U.S.C. § 1 *et seq.*

3. *See American Football History, at* http://wiwi.essortment.com/americanfootbal _rwff.htm.

clubs.[4] Although there are other professional football leagues in North America—including the Arena Football League, the Arena Football League 2, the National Indoor Football League, and the Canadian Football League [5]—the NFL dominates. It consistently outperforms all other professional *sports* leagues, not to mention the other professional football leagues, in both revenues and television ratings.[6] The Super Bowl—the League's championship game—is routinely the top-rated television program of the year,[7] and indeed, four of the top ten highest-rated programs in television history are NFL football games.[8]

Not surprisingly, the League's fiscal success also inures to the benefit of its players. The average NFL player earned $1,258,800 in 2003;[9] the average starting NFL running back (which Clarett aspires to be) earned $1,578,275;[10] the average first-round draft choice (which Clarett also aspires to be) earned $1,367,120;[11] the *minimum* salary that a rookie may be paid is $225,000.[12] In contrast, the 2000 salary cap in the Canadian Football League—the total amount of money that a team was permitted to pay to *all* 50–odd of its players *combined*—was approximately $1,700,000.[13] Similarly, the 2003 team sal-

4. *See* 11/20/03 Second Declaration of Peter Ruocco ("Ruocco Decl.") ¶ 2. Peter Ruocco is the Senior Vice–President of Labor Relations of the NFL Management Council and was personally involved in the 1993 collective bargaining. *See id.* ¶ 1.

5. *See id.* ¶ 10.

6. According to one economist, the NFL, as a league, is valued at slightly less than $18 billion. The National Basketball Association, the next most valuable league, is valued at slightly less than $9 billion, Major League Baseball at approximately $7 billion, and the National Hockey League at less than $5 billion. At $19.6 billion, the NFL's television contracts (the sale of the *rights to air its games*) are more than the value of the NBA ($4.6 billion), MLB ($3.3 billion), and NHL ($600 million) television contracts *combined*. *See* Justin Wolfers, *The Business of Sports: Where's the Money?, at* http://faculty-gsb.stanford.edu/wolfers/Papers/Comments/TheBusinessofSports.pdf.

7. *See Super Bowl Scores Big With Viewers, at* http://cbsnews.cbs.com/stories/2003/01/27/entertainment/main538085.shtml (Jan. 27, 2003) ("The Super Bowl is often the most-watched TV program each year . . . ."). Most recently, almost 90,000,000 Americans watched Super Bowl XXXVIII, held on February 1, 2004. *See Top Ten Primetime Broadcast TV Programs For Week of 1/26/04–2/1/04* (Feb. 3, 2004), *at* http://www.nielsenmedia.com.

8. *See Top 10 Network Telecasts of All Time (Ranked By Household Rating), available at* http://www.nielsenmedia.com/. The only other sporting event in the top ten television programs was the showdown between Nancy Kerrigan and Tonya Harding at the 1994 Olympic Games in Norway. The other entrants on the top ten list include the final episode of *M*A*S*H* (number one all-time), the "Who Shot J.R.?" episode of *Dallas* (two), the final installment of *Roots* (three), and a two-part serialization of *Gone With the Wind* (eight and nine). *Id.*

9. *See* M.J. Duberstein, *2003 Season Omnibus NFL Salary Averages & Trends: Volume One— 2003 Season Salary Averages* (NFLPA Research Dep't 2004), *at* http://www.nflpa.org/PDFs/Shared/2003_Season_Salary_&_Signing_Trends_Omnibus_January_2004.pdf.

10. *Id.* at 3.

11. *Id.* at 99.

12. *See* http://www.nationmaster.com/encyclopedia/American-Professional-Football-Association

13. *See* Canadian Football League Players Association, *Collective Bargaining in the 1990s, at* http://www.cflpa.com/CFLPA/history_1990s.html. The year 2000 team salary cap was set at approximately $2,280,000 Cdn., which converts to roughly $1,700,000 at the current 1:.7472 exchange rate. *See generally*

ary cap in the Arena Football League was $1,643,000.[14] In other words, the average starting running back in the NFL makes only slightly less than the average *teams* do in the CFL and AFL. In short, the NFL represents an unparalleled opportunity for an aspiring football player in terms of salary, publicity, endorsement opportunities, and level of competition.

Day-to-day operation of the League is handled by an appointed Commissioner, currently Paul Tagliabue.[15] Representatives of each of the thirty-two teams, however, comprise the National Football League Management Council ("NFLMC"), the exclusive collective bargaining representative of the League.[16] The 1,400–odd NFL players are exclusively represented by the National Football League Players Association ("NFLPA"),[17] which was created in 1956.[18] In 1968, the NFLPA and the NFLMC entered into the League's first Collective Bargaining Agreement ("CBA").[19]

The current CBA took effect on May 6, 1993, and expires in 2007.[20] The CBA, along with the League's Constitution and Bylaws, comprehensively outlines the relationship between the players and the League, covering the operation of the League, player salary and the player draft, including detailed rules by which the

teams select new players. Two provisions of the CBA are at issue here. Article III, section 1, provides:

> This Agreement represents the complete understanding of the parties on all subjects covered herein, and there will be no change in the terms and conditions of this Agreement without mutual consent.... [T]he NFLPA and the Management Council *waive all rights to bargain with one another concerning any subject covered or not covered in this Agreement* for the duration of this Agreement, *including the provisions of the NFL Constitution and By-laws....* [21]

Article IV, section 2, entitled "No Suit," provides:

> [N]either the NFLPA nor any of its members, agents acting on its behalf, nor any members of its bargaining unit will sue, or support financially or administratively any suit against, the NFL or any Club relating to the presently existing provisions of the Constitution and Bylaws of the NFL as they are currently operative and administered.... [22]

Clarett and the NFL disagree on whether these two provisions establish that the NFL and the players union actually bargained over the terms of the Constitution and Bylaws (which contained the eligibility

---

http://www.bankofcanada.ca/en/exchform.htm.

**14.** *See AFL/AFLPA CBA Term Sheet* (Oct. 14, 2003), *available at* http://www.aflplayers.org/documents/AFLtermsheet.pdf.

**15.** Tagliabue has been Commissioner of the NFL since 1989. *See NFL History: 1981–1990, at* http://www.nfl.com/history/chronology/1981-1990.

**16.** *See* Ruocco Decl. ¶ 2.

**17.** *See id.* ¶ 7.

**18.** *See generally* http://www.nflpa.org/.

**19.** *See Smith v. Pro–Football,* 420 F.Supp. 738, 741 (D.D.C.1976) ("As of March 5, 1968, the National Football League Players Association became the exclusive bargaining agent and representative of the NFL players. This union executed its first collective bargaining agreement with the NFL owners in November of 1968 ...."), *aff'd in part and rev'd in part,* 593 F.2d 1173 (D.C.Cir.1978).

**20.** *See* Ruocco Decl. ¶ 7. The CBA appears to have been amended (presumably not in a material way) as recently as January 8, 2002. *See* Ex. D to Ruocco Decl.

**21.** *See* Ex. D to Ruocco Decl. (emphasis added).

**22.** *See* Ex. E to Ruocco Decl.

Rule at issue), or merely bargained away the NFLPA's ability to bargain over or challenge the Bylaws' provisions.[23]

## B. The Rule

The NFL's eligibility Rule precluding college underclassmen from participating in the draft has been in force—in one form or another—for decades.[24] "It was adopted after Illinois's star running back, Harold 'Red' Grange, stunned the sports world by leaving school at the end of the 1925 college season and joining the Chicago Bears of the five-year-old NFL for a reported $50,000."[25] The original Rule precluded a player from joining the NFL unless four seasons had elapsed since his high school graduation; in 1990, the requirement was changed to three seasons.[26]

Notwithstanding the fact that the Rule predates the CBA, the NFL maintains that "[d]uring the course of collective bargaining that led to the 1993 CBA, the eligibility rule itself was the subject of collective bargaining."[27] On May 6, 1993—the same day that the current CBA became effective—the NFLPA and the NFLMC also executed a side letter acknowledging that the Constitution and Bylaws attached to the letter were referenced in the CBA.[28] Among the various provisions of the 1993 Bylaws are comprehensive rules describing who is eligible to play in the NFL. The Bylaws provided that a player became eligible if he exhausted his eligibility to play college football or graduated from college.[29] A player was also eligible if he was five years removed from his first enrollment in college (or four years removed, if he never played college football), regardless of whether he had any remaining college eligibility.[30] Finally, a player not otherwise eligible could be granted "Special Eligibility."[31]

Such a player has been granted eligibility through special permission of the

---

**23.** The NFL also points to Article IX of the CBA, in which the NFLPA and NFLMC agree to resolve any dispute they may have involving the interpretation or application of the CBA, the Constitution, or the Bylaws in accordance with the CBA's grievance procedure. *See id.*, Ex. F. The existence of Article IX proves only that the parties bargained over a grievance procedure, not that they bargained over the Constitution and Bylaws themselves.

**24.** *See* Robert A. McCormick & Matthew C. McKinnon, *Professional Football's Draft Eligibility Rule: The Labor Exemption and the Antitrust Laws*, 33 Emory L.J. 375, 377 & n. 12 (1984) (tracing the origin of the Rule to 1925).

**25.** Charles Lane, *Clarett Lines Up Against NFL*, Wash. Post, Jan. 23, 2004, at D1. *See generally* Benjamin G. Rader, *American Sports* (1993) ("In 1925 Grange's decision touched off a national debate. By abandoning his studies for a blatantly commercial career, he openly flaunted the myth of the college athlete as a gentleman-amateur who played merely for the fun of the game and the glory of his school. Grange's Illinois coach, Zup Zuppke, joined a host of academics in condemning Grange. Not only was professional football held in low moral esteem, but to them it was unethical for Grange to capitalize upon a reputation that he had acquired in college for direct, personal gain.").

This information is provided by way of background only. The record before the court only evidences that the rule is more than 50 years old and predates the CBA and the formation of the NFLPA. *See* Transcript, *Clarett v. National Football League*, 03 Civ. 7441 (S.D.N.Y. Sept. 30, 2003) ("Tr.") at 12 ("Previous forms of this rule go back ... 50 years") (statement of Gregg Levy, counsel to the NFL).

**26.** *See* Lane, *Clarett Lines Up Against NFL*.

**27.** Ruocco Decl. ¶ 8.

**28.** *See* Ex. G to Ruocco Decl.; *see also* Ex. A to Ruocco Decl. (the "Bylaws").

**29.** *See* Bylaws §§ 12.1(A)-(B).

**30.** *See id.* §§ 12.1(C)-(D).

**31.** *See id.* § 12.1(E).

Commissioner. In order to receive consideration for the League's principal college draft in any year, any application for special eligibility must be in the Commissioner's office no later than January 6 of that year. For college football players seeking special eligibility, *at least three NFL seasons must have elapsed since the player was graduated from high school.*[32]

Although by its plain language the Rule requires the "special permission" of the Commissioner, that permission appears to be routinely granted where a player falls within the ambit of the Rule (*i.e.*, is clearly three years removed from his high school graduation).[33]

In 2003, the form of the Rule changed yet again when the NFLMC promulgated revised Bylaws.[34] The record is unclear as to whether these new Bylaws were the subject of collective bargaining, although Article III, section 1 of the CBA requires the NFLMC and NFLPA to negotiate in good faith any changes that "could significantly affect the terms and conditions of employment of NFL players."[35]

Under the 2003 version of the Bylaws, the Rule is omitted altogether. In its place is a reference to a separate memorandum promulgated by the Commissioner under section 8.5 of the Bylaws.[36] Section 8.5, in turn, provides that "[t]he Commissioner shall interpret and from time to time establish policy and procedure in respect to the provisions of the Constitution and Bylaws and any enforcement thereof."[37] Thus, under the 2003 Bylaws, the Rule now exists only as "policy and procedure" established by the Commissioner and cited in the Bylaws. With respect to the 2004 draft, the Commissioner has issued a release that includes the following iteration of the Rule:

> **SPECIAL ELIGIBILITY.** Such player has been granted eligibility through special permission of the Commissioner. Any applications for special eligibility must be in the Commissioner's office no later than Thursday, January 15, 2004, if the player is to be considered for inclusion in the League's principal draft scheduled for April 24–25, 2004. Applications will be accepted only for college players for whom at least three full *college seasons* have elapsed since their high school graduation. Players will not be permitted to elect to bypass the January 15 deadline in order to seek eligibility for a later supplemental draft, and

---

32. *See id.* § 12.1(E) (emphasis added).

33. *See, e.g., 41 Authorized to Leave Early for the Draft*, Milwaukee J. Sentinel, Jan. 20, 2004, at 3C. Where it is unclear whether a player qualifies for special eligibility, however, the Commissioner has a modicum of discretion. For example, the Commissioner is currently considering the application of University of Pittsburgh wide receiver Larry Fitzgerald. Fitzgerald, like Clarett, is completing his sophomore year of college. But unlike Clarett, Fitzgerald spent a year at a prep school between high school and college. According to press reports, the Commissioner is expected to declare Fitzgerald eligible but is apparently delaying until after this Court rules on the instant motions because it "does not want to complicate matters for the judge in the Clarett case." *Fitzgerald Announce-*

*ment Likely a Formality* (Feb. 1, 2004), *at* http://sports.espn.go.com/ncf/news/story?id=1724779.

34. *See* Bylaws.

35. *See* Ex. D to Ruocco Decl.

36. *See* Bylaws (providing the following citation after section A of "General Rules of Eligibility": "*See* NFLNet Memorandum, February 16, 1990, establishing policy and procedure pursuant to Article VIII, Section 8.5, permitting college players to apply for special draft eligibility if at least three football seasons have elapsed since their graduation from high school, App., p.1990–4.").

37. *See* Ex. B to Ruocco Decl.

no supplemental draft will be held to accommodate such an election.[38]

It is this version of the Rule that Clarett challenges.

The NFL provides a number of justifications for the Rule, arguing that it protects at least four different classes of people. *First*, the NFL contends that the Rule protects the people it excludes because they "are not sufficiently mature, either physically or psychologically, to endure the rigors of professional football."[39] *Second*, the Rule protects member clubs who might suffer financial adversity resulting from younger players' peculiar susceptibility to injury.[40] *Third*, the Rule protects the League and its "entertainment product from the adverse consequences associated with such injuries."[41] *Fourth*, the Rule protects young players who, if they declare but are not drafted, would lose their eligibility to play college football,[42] or who might over-train or experiment with performance-enhancing drugs to speed their athletic development.[43]

## C. Maurice Clarett

Clarett, now twenty years old,[44] graduated high school on December 11, 2001.[45] His credentials as a football player are impressive. In the 2002–2003 collegiate season, Clarett—the first freshman starter at running back for The Ohio State University ("OSU") since 1943[46]—led his team to an undefeated (14‑0) season that was capped by a 31–24 double-overtime victory over University of Miami in the Fiesta Bowl, OSU's first national championship in thirty-four years.[47] As a result of his freshman year resounding success, Clarett

---

**38.** *See* National Football League Eligibility Rules (emphasis added), Ex. D to Plaintiff's Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Clarett Reply"). While there is no independent authentication of this document, the Bates stamp reflects that it was produced by the NFL.

The Rule as it exists in the Commissioner's memorandum requires a player to be three full *college* seasons removed from his high school graduation, while the Rule contained in Section 12.1(E) of the 1993 Bylaws required a player to be three *NFL* seasons removed from high school. In fact, the NFL and college seasons are nearly coterminous, and the Commissioner has interpreted the Rule in the same way since the 1991 draft. *See* Ex. D to Clarett Reply (containing the Commissioner's memoranda regarding draft eligibility for every year between the 1991 and 2004 draft, all of which refer to "three full college seasons").

**39.** *See* Ruocco Decl. ¶ 5. *See also* Declaration of Jordan D. Metzl, M.D. ("Metzl Decl.") (attesting to the medical reasonableness of the Rule).

**40.** *See* Ruocco Decl. ¶ 5. *See also* Memorandum of the National Football League (1) in Opposition to Plaintiff's Motion for Summary Judgment and (2) in Support of the NFL's Cross–Motion for Summary Judgment (Non–Statutory Labor Exemption) ("NFL Mem.") at 4 (arguing that the Rule "protect[s] the NFL clubs from the costs and potential liability entailed by such injuries").

**41.** NFL Mem. at 4.

**42.** *See* Ruocco Decl. ¶ 6. Once a player makes himself available to be drafted into the NFL, he sacrifices any remaining collegiate football eligibility under the rules of the National Collegiate Athletic Association ("NCAA").

**43.** *See* Metzl Decl. ¶ 16.

**44.** *See* Affidavit of Maurice Clarett ("Clarett Aff.") ¶ 4, Ex. A to the Declaration of Alan C. Milstein ("Milstein Decl."), counsel to Clarett.

**45.** *See id.* ¶ 6.

**46.** *See id.* ¶ 7.

**47.** *See id.* ¶ 10. *See generally Clarett Finds Way to Hurt "Canes in Clutch"* (Jan. 4, 2003), *at* http://espn.go.com/ncf/bowls02/s/fiesta_clarettclutch.html. In the Fiesta Bowl, Clarett rushed for 47 yards and 2 touchdowns—including the winning score in double-overtime. *See* http:// sports.espn.go.com/ ncf/boxscore?gameId=230032390.

was named the Big Ten Freshman of the Year and voted the best running back in college football by *The Sporting News*.[48]

Clarett claims that he wanted to declare for the April 2003 NFL draft after his strong freshman season,[49] but offers no explanation as to why he did not challenge the Rule at that time. Clarett's status changed in September 2003, however, when OSU and the NCAA suspended him for the entire 2003–2004 season.[50] As a result, he did not play during the just-concluded college football season. Moreover, there appears to be some question as to whether the NCAA will permit him to play in the 2004–2005 season.[51] Clarett's

decision to seek eligibility for the 2004 draft may have resulted, in part, from this suspension. The NFL may be his only real option for playing football next year.

Clarett, who is six feet tall and weighs 230 pounds,[52] is taller and heavier than some of the NFL's all-time greatest running backs, including Walter Payton (5'10", 200), Barry Sanders (5'8", 203) and Emmitt Smith (5'9", 207).[53] While sportswriters disagree about which team would draft him and in which round, there seems to be little doubt that Clarett is an NFL-caliber player who would be drafted if he were eligible to participate in the process.[54] Thus, only the Rule stands between Clarett and the opportunity to play in the NFL next year.[55]

**48.** *See* Clarett Aff. ¶ 11. The Big Ten is a collegiate athletic conference that includes eleven schools: University of Illinois, Indiana University, University of Iowa, University of Michigan, Michigan State University, University of Minnesota, Northwestern University, OSU, The Pennsylvania State University, Purdue University and University of Wisconsin. In the 2002–2003 season, when Clarett was named Big Ten Freshman of the Year, the Big Ten was a particularly competitive conference, with OSU, Iowa, Michigan and Penn State all finishing among the top fifteen teams in the three major college football rankings (the Bowl Championship Series, Associated Press poll, and USA Today/ESPN poll). *See* http://espn.go.com/abcsports/bcs/rankings/.

**49.** *See* Clarett Aff. ¶ 12.

**50.** *See generally* Rusty Miller, *Clarett Suspended for 2003 for 16 NCAA Violations* (Sept. 10, 2003), *available at* http://www.usatoday.com/spor ts/college/football/bigten/2003–09–10–clarett–suspension_x.htm.

**51.** *See* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Clarett Mem.") at 9.

**52.** *See id.*

**53.** *See* Bob Carroll, et al., eds., *Total Football II: The Official Encyclopedia of the National Football League* (1999), Ex. H. to Milstein Decl. Although size is not always an asset to a running back, *see* Bob Glauber, *Clarett No Lock for First Round,* Newsday, Sept. 28,

2003, at B7, some of the greatest running backs have also been larger than Clarett (*e.g.,* Hall of Famers Jim Brown (6'2", 232) and Larry Csonka (6'3", 240)). *See Jim Brown, at* http://. www.clevelandbrowns.com/history/hof_brownj.php; *Biography, at* http://www.larrycsonka.com/bio/.

**54.** *Compare* Michael Wilbon, *For Clarett, It's a Bad Move,* Wash. Post, Sept. 25, 2003, at D1 (questioning whether Clarett is worthy of a top pick in the NFL draft) *with* Bob Glauber, *Clarett Sues NFL for Right to Enter Draft,* Newsday, Sept. 24, 2003, at A60 (reporting that "according to several league executives," if Clarett were in the 2004 draft, "it's likely he would be a first-round choice."). *See also* Complaint ("Compl.") ¶ 31 ("Had Clarett been eligible for the 2003 Draft, it is almost certain he would have been selected in the beginning of the First Round and would have agreed to a contract and signing bonus worth millions of dollars.").

**55.** Clarett argues that he actually *is* eligible under the Rule. Even if that question were properly before the Court—which it is not—it seems plainly incorrect under the current version of the Rule, which requires three *full* college football seasons to have elapsed since a player's high school graduation. A college football season runs from roughly late August (OSU played its first game this past year on August 30) to early January, if bowl games are included (OSU played its final game on January 2), or late November if they are not

## D. Procedural History

This case has progressed rapidly, virtually rushing toward the goal line because of the imminence of the 2004 draft. Clarett filed suit on September 23, 2003. At the initial scheduling conference, held one week later, both parties informed the Court that they intended to move for summary judgment. After limited document discovery, the parties' cross-motions for summary judgment were fully submitted on December 11, 2003. In two separate motions, the NFL asks for summary judgment on its defenses that (1) the Rule is protected from antitrust scrutiny by the nonstatutory labor exemption; and (2) Clarett lacks antitrust standing. Clarett, in turn, seeks summary judgment on his single antitrust claim. The NFL opposes Clarett's motion, claiming that if the suit is not dismissed on the grounds set forth in its motions, a trial is needed to determine whether the Rule is a reasonable restraint of trade.

## III. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [56] "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " [57] A fact is material when it " 'might affect the outcome of the suit under the governing law.' " [58]

A party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists.[59] In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, he "must show more than a 'metaphysical doubt' as to material facts," [60] and he may not rely on conclusory allegations or unsubstantiated speculation.[61] Rather, the non-moving party must produce admissible evidence that supports his pleadings.[62] In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." [63]

In determining whether a genuine issue of material facts exists, the court must construe the evidence in the light most favorable to the non-moving party and

(OSU played its final regular season game on November 22). Clarett graduated high school in December 2001. Thus, only two full college seasons have elapsed since his graduation: the season running from August 2002 to January 2003, and the season running from August 2003 to January 2004.

**56.** Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**57.** *Electrical Inspectors, Inc. v. Village of East Hills,* 320 F.3d 110, 117 (2d Cir.2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied sub nom. Village of Islandia v. Electrical Inspectors, Inc.,* —— U.S. ——, 124 S.Ct. 467, 157 L.Ed.2d 373 (2003).

**58.** *Id.* (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

**59.** *See Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.1987) (citing *Adickes v. S.H. Kress*

& *Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

**60.** *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

**61.** *See Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990) (holding that "[c]onclusory allegations will not suffice to create . . . a genuine issue" of material fact sufficient to overcome a motion for summary judgment); *see also Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001).

**62.** *See First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

**63.** *Niagara Mohawk Power Corp. v. Jones Chem. Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct.

draw all inferences in that party's favor.[64] Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[65] Summary judgment is therefore inappropriate "if there is *any* evidence in the record that could reasonably support a jury's verdict for the non-moving party."[66] Nonetheless, the Second Circuit has remarked that "[i]n the context of antitrust cases ... summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces."[67]

## IV. DISCUSSION

■ Clarett is suing the NFL under section 1 of the Sherman Antitrust Act[68] and section 2 of the Clayton Act.[69] He alleges that the Rule is an illegal restraint of trade because the teams have agreed to exclude a broad class of players from the NFL labor market, thereby constituting a "group boycott."[70] In order to prevail on that claim, Clarett must demonstrate that he is entitled to judgment on the merits. However, he must first overcome the two affirmative defenses asserted by the NFL: (1) that the Rule is immune from the antitrust laws, and (2) that Clarett lacks standing to bring an antitrust claim.

### A. The Nonstatutory Labor Exemption

The NFL argues that the Rule is immune from antitrust scrutiny based on what has come to be known as the "nonstatutory labor exemption." If the NFL is correct, the exemption provides a complete defense to Clarett's suit. Accordingly, I address the application of the nonstatutory labor exemption at the outset.

### 1. Purpose and Background of the Nonstatutory Labor Exemption

■ In order to answer the question of whether the Rule is subject to the antitrust laws, a brief discussion of the labor exemptions—which collectively immunize

---

2505). *See also Twin Labs.*, 900 F.2d at 568 ("There must be more than a scintilla of evidence, and more than some metaphysical doubt as to the material facts.") (quotation marks and citations omitted).

**64.** *Niagara Mohawk*, 315 F.3d at 175 (citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505).

**65.** *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

**66.** *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir.2002) (emphasis added) (citing *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir.2000)). *See also Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir.1992) (Thurgood Marshall, J., retired and sitting by designation).

**67.** *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 104 (2d Cir.2002). *See also Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 541 (2d Cir.1993).

**68.** 15 U.S.C. § 1. The Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade." *Id.*

**69.** Private plaintiffs cannot sue directly under the Sherman Act. Rather, section 2 of the Clayton Act creates a private right of action for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." *Id.* § 15.

**70.** *See* Compl. ¶¶ 32–43. "Group boycotts ... generally consist of agreements by two or more persons not to do business with other individuals, or to do business with them only on specified terms." *Balaklaw v. Lovell*, 14 F.3d 793, 800 (2d Cir.1994); *see also Haywood v. National Basketball Ass'n*, 401 U.S. 1204, 1206, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971) (Douglas, J.) (describing a similar age-based eligibility restriction in the NBA as posing a "significant" "group boycott issue in professional sports"). Group boycotts are also sometimes referred to as "concerted refusals to deal." *See* 13 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 2200 (2000).

otherwise anticompetitive conduct from antitrust scrutiny—is required. The statutory exemptions, contained in provisions of the Clayton Act [71] and the Norris–LaGuardia Act,[72] exempt certain activities engaged in by labor unions.[73] The nonstatutory exemption, created by the courts, was designed to favor labor law over antitrust law by permitting collective bargaining between unions and employers over wages, hours and working conditions. Because the Rule is not covered by the statutory exemption, it is subject to the antitrust laws unless the nonstatutory labor exemption applies.[74]

The Supreme Court has "implied this [nonstatutory] exemption from federal labor statutes, which set forth a national labor policy favoring free and private collective bargaining, *which require good-faith bargaining over wages, hours, and working conditions* . . . ." [75] Thus, the Court recognized the primacy of collective bargaining in the workplace, even when the agreements reached through that bargaining would otherwise violate the antitrust laws' prohibition on combinations in restraint of trade:

> As a matter of logic, it would be difficult, if not impossible, to require groups of employers and employees to bargain together, but at the same time to forbid them to make among themselves or with

each other *any* of the competition-restricting agreements potentially necessary to make the process work or its results mutually acceptable. Thus, the implicit exemption recognizes that, to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition *imposed through the bargaining process* must be shielded from antitrust sanctions.[76]

While the Second Circuit has not adopted a test that controls the application of the nonstatutory labor exemption, three other circuits have. The Sixth, Eighth and Ninth Circuits have looked to the following three-factored test:

> First, the labor policy favoring collective bargaining may potentially be given preeminence over the antitrust laws where the restraint on trade primarily *affects only the parties to the collective bargaining relationship.* Second, federal labor policy is implicated sufficiently to prevail only where the agreement sought to be exempted *concerns a mandatory subject of collective bargaining.* Finally, the policy favoring collective bargaining is furthered to the degree necessary to override the antitrust laws only where the agreement sought to be exempted is the *product of bona fide arm's-length bargaining.*[77]

---

**71.** *See* 15 U.S.C. § 17; 29 U.S.C. § 52.

**72.** *See* 29 U.S.C. §§ 104, 105, 113.

**73.** *See Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 621–22, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). The statutory exemption immunizes traditional union conduct—such as boycotts and secondary picketing—that would otherwise unquestionably qualify as concerted action in restraint of trade. *See, e.g., United States v. Hutcheson,* 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941).

**74.** *See id.* at 622, 95 S.Ct. 1830 (citing *Local Union No. 189, Amalgamated Meat Cutters,*

*and Butcher Workmen of N. Am. v. Jewel Tea Co.,* 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965)).

**75.** *Brown v. Pro Football, Inc.,* 518 U.S. 231, 236, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996) (emphasis added, citations omitted).

**76.** *Id.* at 237, 116 S.Ct. 2116 (second emphasis added); *see also id.* at 254, 116 S.Ct. 2116 (Stevens, J., dissenting).

**77.** *Mackey v. National Football League,* 543 F.2d 606, 614 (8th Cir.1976) (emphasis added; citations and footnotes omitted); *accord Continental Maritime of San Francisco, Inc. v.*

In a more recent case, the Second Circuit acknowledged the test promulgated by the Eighth Circuit, but preferred to apply the simple formulation enunciated by the Supreme Court in *Local Union No. 189 v. Jewel Tea Co.* In doing so, the Second Circuit held that the appropriate test is "one that balances the conflicting policies embodied in the labor and antitrust laws, with the policies inherent in labor law serving as the first point of reference."[78]

> First, the agreement at issue must further goals that are protected by national labor law and that are within the scope of *traditionally mandatory subjects of collective bargaining.* Second, the agreement must not impose a "direct restraint on the business market [that] has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions [that result from collective bargaining agreements]."[79]

Thus, because the labor laws only require collective bargaining as to certain subjects, and the nonstatutory labor exemption was designed to shield from antitrust scrutiny conduct that is *mandated* under the labor laws, the exemption is limited to policies that affect "traditionally mandatory subjects of collective bargaining."[80]

## 2. The Scope of the Nonstatutory Labor Exemption

■ Under the National Labor Relations Act, mandatory subjects of bargaining between employers and unions pertain to "wages, hours, and other terms and conditions of employment."[81] Only agreements on these subjects (and intimately related subjects) are exempt from the antitrust laws.[82] In *Jewel Tea,* the Court succinctly summarized the issue before it: "[W]hether the marketing hours restriction [during which butchers could sell fresh meat], like wages, and unlike prices is so intimately related to wages, hours and working conditions that ... [it] falls within the protection of the national labor policy and is therefore exempt from the Sherman Act."[83] By contrast, the Court

*Pacific Coast Metal Trades District Council,* 817 F.2d 1391, 1393 (9th Cir.1987); *McCourt v. California Sports, Inc.,* 600 F.2d 1193, 1197–98 (6th Cir.1979).

**78.** *Local 210, Laborers' Int'l Union of N. Am. v. Labor Relations Div. Associated Gen. Contractors of Am.,* 844 F.2d 69, 79 (2d Cir.1988); *see also id.* at 80 n. 2 ("Although we believe that the agreement in the instant case could satisfy [the Eighth Circuit's *Mackey*] test, we need not adopt this particular analysis. Rather, we rely on ... *Jewel Tea.*").

**79.** *Id.* at 79–80 (emphasis added, citations omitted, alterations in original) (quoting *Connell Constr.,* 421 U.S. at 625, 95 S.Ct. 1830).

**80.** *Id.* at 79. The NFL does not dispute that the nonstatutory exemption applies only to agreements regarding mandatory subjects of bargaining. *See* NFL Mem. at 13–14.

**81.** 29 U.S.C. § 158(d); *see also NLRB v. Borg–Warner Corp.,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

**82.** *See Jewel Tea,* 381 U.S. at 689, 85 S.Ct. 1596; *see generally* 1A Areeda & Hovenkamp, *Antitrust Law* ¶ 257c (noting that "there seems to be a single taproot [for application of the labor exemptions]: whether the challenged activities are seen as 'legitimate' labor activities directed at the wages, hours, and working conditions of the employees.").

**83.** *Id.* at 689–90, 85 S.Ct. 1596; *see also* Michael S. Jacobs & Ralph K. Winter, Jr., *Antitrust Principles and Collective Bargaining by Athletes: Of Superstars in Peonage,* 81 Yale L.J. 1, 24 (1971) ("Important in Justice White's calculus was the fact that the marketing hours provision was a subject 'well within the realm of wages, hours and other terms and conditions of employment' about which employers and unions must bargain' ") (quoting *Jewel Tea,* 381 U.S. at 691, 85 S.Ct. 1596).

noted that Jewel Tea, a chain of food-marketing stores, "need not have bargained about or agreed to a schedule of *prices* at which its meat would be sold." [84]

More recently, in *Brown v. Pro Football, Inc.*, the Court reiterated that the exemption is limited to mandatory subjects of collective bargaining and covers only conduct that arises from the collective bargaining *process*. [85] In *Brown*, the question was whether a unilateral decision by team owners to impose a salary cap on NFL practice squad players violated the antitrust laws when that cap was imposed by team owners after reaching a bargaining impasse with the NFLPA. In holding that the nonstatutory labor exemption applied to this wage limitation, the Court noted that "impasse and an accompanying implementation of proposals constitute *an integral part of the bargaining process.*" [86] The Court repeatedly stated that the purpose behind the exemption is to support the collective bargaining *process* and ensure that it works in the manner intended by Congress.

■ Finally, the exemption can only cover actions that affect employees within the bargaining unit or those who seek to become employees and who will therefore be bound by those actions. [87] It is axiomatic that wages, hours, and other conditions of employment—such as employee benefits—can only apply to employees.

### 3. The Rule Is Not Covered by the Nonstatutory Labor Exemption

#### a. The Rule Does Not Address a Mandatory Subject of Collective Bargaining

■ The Rule provides that for college players seeking special eligibility, "at least three full college seasons [must] have elapsed since their high school graduation." [88] Nowhere is there a reference to wages, hours, or conditions of employment. Indeed, the Rule makes a class of potential players *unemployable.* Wages, hours, or working conditions affect only those who are employed or eligible for employment.

The NFL argues that "[i]f the draft itself is protected by the non-statutory labor exemption, it follows *a fortiori* that rules governing eligibility for the draft ... are also protected by the exemption." [89] In support of this proposition, the NFL relies heavily on three recent Second Circuit cases all arising in the context of professional sports. [90] However, each of those cases involve practices that affect wages, hours or working conditions.

In *Wood v. National Basketball Association*, a college basketball player was a first-round draft choice in the 1984 college draft. Once drafted, Wood challenged three league provisions: (1) a team's exclusive right to bargain with its draft choice for a period of one year; (2) the salary cap that permitted the team to offer a first-year draftee only $75,000 if that team had reached its maximum allowable team salary; and (3) a limitation on player corporations utilized by players to create tax advantages. [91] The Second Circuit held that

---

84. *Jewel Tea,* 381 U.S. at 689, 85 S.Ct. 1596 (emphasis added).

85. 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521.

86. *Id.* at 239, 116 S.Ct. 2116 (emphasis added).

87. *See Mackey,* 543 F.2d at 614.

88. *See supra* note 38.

89. NFL Mem. at 13–14.

90. *See Caldwell v. American Basketball Ass'n,* 66 F.3d 523 (2d Cir.1995); *National Basketball Ass'n v. Williams,* 45 F.3d 684 (2d Cir. 1995); *Wood v. National Basketball Ass'n,* 809 F.2d 954 (2d Cir.1987).

91. *See Wood,* 809 F.2d at 957–58.

the nonstatutory labor exemption barred Wood's action. The court explained: "The gravamen of Wood's complaint, namely that the NBA–NBPA collective agreement is illegal because it prevents him from achieving his full free market value, is . . . at odds with, and destructive of, federal labor policy." [92] The point is not hard to grasp. Wood was drafted and then challenged the agreement between the league and the players union that limited his right to negotiate about certain conditions of his employment—namely which team he would play for, how much he would earn, and how he would receive his salary. Indisputably, these *all* involve wages and conditions of employment and are thus mandatory subjects of bargaining.[93]

*National Basketball Association v. Williams* also involved a dispute between the players and the league over the draft and the salary cap. A collective bargaining agreement, set to expire in 1994, governed the relationship between the players and the league.[94] During negotiations for a new CBA, the players sought elimination of three provisions of the expiring CBA: (1) the workings of the college draft whereby once drafted a player could only negotiate with the team that drafted him; (2) the right of first refusal permitting a team to match any offer made by another team to one of its current players; and (3) the revenue sharing/salary cap system establishing an overall wage framework.[95] The negotiations eventually reached an impasse, and the league brought an action seeking a declaration that the disputed provisions of the CBA did not violate the

antitrust laws by virtue of the nonstatutory exemption.[96] The court agreed. Following *Wood,* the court held that each of the disputed terms governed players who are or would be employed by the league, and addressed the players' rights to negotiate over the team they will play for and the salary they will earn. These topics, by definition, concern the terms and conditions of employment that attach once a player is drafted.

Finally, in *Caldwell v. American Basketball Association,* the plaintiff challenged his discharge. Caldwell claimed that he was wrongfully discharged because of his activities as the president of the players union, and that the league refused to employ him for those activities. The league asserted that Caldwell no longer had the physical capacity to play basketball. Caldwell sued the league alleging that his exclusion violated the antitrust laws. Holding that the nonstatutory labor exemption applied, the court stated that "Caldwell's right to challenge a discharge by the [league] had to be founded on labor rather than antitrust law." [97] In discussing both Caldwell's discharge and the league's refusal to employ him, the court stated that, "[t]his dispute is the familiar case of an employee asserting a discharge based on union activities." [98] While the court used broad language in holding that the league's policy regarding player suspension fell within the nonstatutory labor exemption because "a mandatory subject of bargaining pertinent in the instant matter is the circumstances under which an employer may discharge or refuse to hire an employ-

---

92. *Id.* at 959.

93. The court held that the NBA's salary cap and college draft "are mandatory subjects of bargaining" because "[e]ach of them clearly is intimately related to wages, hours, and other terms and conditions of employment." *Id.* at 962 (quotation marks and citations omitted).

94. *See Williams,* 45 F.3d at 686.

95. *See id.* at 686.

96. *Id.*

97. *Caldwell,* 66 F.3d at 530.

98. *Id.*

ee," the decision makes clear that the court treated the refusal to hire as synonymous with the dismissal.[99] The point is simple. *Caldwell* addresses a mandatory subject of bargaining—namely the conditions under which an employer may terminate an employee.

In sum, none of the cases cited by the NFL involve job *eligibility*. The league provisions addressed in *Wood, Williams*, and *Caldwell* govern the terms by which those who *are drafted* are employed. The Rule, on the other hand, precludes players from entering the labor market altogether, and thus affects wages only in the sense that a player subject to the Rule will earn none. But the Rule itself, for the reasons just discussed, does not concern wages, hours, or conditions of employment and is therefore not covered by the nonstatutory labor exemption.

#### b. The Nonstatutory Labor Exemption Cannot Apply to Those Who Are Excluded from the Bargaining Unit

[redacted] The exemption is also inapplicable because the Rule *only* affects players, like Clarett, who are complete strangers to the bargaining relationship. The labor laws cannot be used to shield anticompetitive agreements between employers and unions that affect only those outside of the bargaining unit.[100] There is no dispute that collective bargaining agreements, and therefore the nonstatutory labor exemption, apply to both prospective and current employees.[101] Newcomers to an industry may not object to provisions of collective bargaining agreements that speak to wages, hours, or conditions of employment on the grounds that they were not present for the bargaining sessions. "[N]ewcomers in the industrial context routinely find themselves disadvantaged vís-a-vís those already hired .... that is [ ] a commonplace consequence of collective agreements."[102] Indeed, the *Wood* court held that a player, once drafted, could not object to the league's salary structure on the grounds that he never consented to the collective bargaining agreement.[103]

Clarett's situation is very different. He is not permitted to be drafted—allegedly because the NFL and the union agreed to exclude players in his class. But Clarett's eligibility was not the union's to trade away. Indeed, the Rule does not deal with the rights of *any* NFL players or draftees. That the nonstatutory exemption does not apply in such a case is simply the flip side of the rule that the exemption only applies to mandatory subjects of collective bargaining, those governing wages, hours, and working conditions. Employees who are hired after the collective bargaining agree-

99. *Id.* at 528; *see also id.* at 529 ("Caldwell's claim regarding his *discharge* ....") (emphasis added). The court noted that Congress intended that this type of dispute should be heard by the National Labor Relations Board rather than the courts. If this were not the case, "every employee who is *discharged* could bring an antitrust action similar to Caldwell's." *Id.* (emphasis added).

100. *See Mackey*, 543 F.2d at 614 ("[T]he labor policy favoring collective bargaining may potentially be given pre-eminence over the antitrust laws where the restraint on trade primarily affects *only* the parties to the collective bargaining relationship.") (emphasis added).

101. *See generally Wood*, 809 F.2d at 960.

102. *Id.* at 960.

103. The district court's holding was especially clear on this point:

> At the time an agreement is signed between the owners and the players' exclusive bargaining representative, all players within the bargaining unit and those who enter the bargaining unit during the life of the agreement are bound by its terms.

*Wood v. National Basketball Ass'n*, 602 F.Supp. 525, 529 (S.D.N.Y.1984), *aff'd*, 809 F.2d 954.

ment is negotiated are nonetheless bound by its terms because they step into the shoes of the players who did engage in collective bargaining. But those who are categorically denied eligibility for employment, even temporarily, cannot be bound by the terms of employment they cannot obtain. For this reason, too, the nonstatutory exemption does not apply.

### c. The NFL Has Failed to Show that the Rule Arose from Arm's Length Negotiations

■ The nonstatutory exemption does not apply for a third reason: the NFL has failed to demonstrate that the Rule evolved from arm's-length negotiations between the NFLMC and the NFLPA. If there is any doubt on this issue, the NFL is not entitled to summary judgment on this defense.

The record is peculiarly sparse in establishing the evolution of the Rule. Indeed, what the record omits speaks louder than what it contains. As noted above, the Rule was first adopted shortly after the 1925 draft.[104] The NFLPA was not formed until 1956, did not become the players' exclusive bargaining agent until 1968,[105] and the first collective bargaining agreement was not adopted until 1968.[106] From these meager facts, it seems quite clear that the first version of the Rule could not have arisen from the collective bargaining process. The NFL offers no evidence that

the Rule was addressed during collective bargaining negotiations prior to 1993.

The only evidence that it was addressed in 1993 is the following conclusory statement from the Declaration of Peter Ruocco: "During the course of collective bargaining that led to the 1993 CBA, the eligibility rule itself was the subject of collective bargaining." [107] But the CBA never mentions the Rule. Rather, the CBA states that the NFLPA "*waive[s]* . . . its rights to bargain over any provision of the Constitution and Bylaws . . . to sue the NFL over any provision of the Constitution and Bylaws . . . [and] to resolve any dispute . . . involving the interpretation or application of the Constitution and Bylaws in accordance with the dispute resolution procedures of the CBA." [108] While these references to the 1993 Bylaws, which in fact contained the then-existing version of the Rule, demonstrate that the union agreed not to *bargain over* or *challenge* the Rule, they in no way demonstrate that the Rule itself arose from, or was agreed to during, the process of collective bargaining. Quite the contrary. As noted, the CBA states that the "NFLPA *waived* . . . its rights *to bargain* over any provision of the Constitution and Bylaws." [109] Thus the only proof submitted by the NFL strongly suggests that the Rule was never the subject of collective bargaining between the League and the union, and did not arise from the collective bargaining process.[110]

---

104. *See supra* note 25.

105. *See Smith*, 420 F.Supp. at 741.

106. *See id.*

107. Ruocco Decl. ¶ 8.

108. *Id.* (referencing Articles III, IV, and IX of the 1993 CBA) (emphasis added).

109. Ex. D to Ruocco Decl. (emphasis added).

110. The NFL makes much of a side letter dated May 6, 1993. This letter adds nothing to the record. The letter is from the general

counsel of the NFLPA to the attorney for the NFLMC. The full text of the letter follows: "This letter confirms that the attached documents are the presently existing provisions of the Constitution and Bylaws of the NFL referenced in Article IV, Section 2, of the Collective Bargaining Agreement." Ex. G to Ruocco Decl. Indeed, the 2003 version of the Rule is now *omitted* from the Bylaws. Instead, the Bylaws now refer to a memorandum from the Commissioner issued pursuant to his power to establish policy and procedure with respect to the Constitution and Bylaws. The Commissioner has issued a release that describes

While Clarett offers no *evidence* on the issue of arm's-length bargaining, he certainly highlights the NFL's absence of proof. Because the NFL has not demonstrated that the Rule evolved from this process, the NFL is not entitled to summary judgment based on the nonstatutory labor exemption.

## B. Antitrust Standing

Having rejected the application of the nonstatutory labor exemption, I turn next to the merits of Clarett's antitrust claim. In order to assert that claim, Clarett must demonstrate that he has suffered an antitrust injury.[111]

### 1. The Antitrust Injury Requirement

 Antitrust injury—an element of antitrust standing[112]—is (1) "injury of the type the antitrust laws were intended to prevent" and (2) injury "that flows from that which makes defendants' acts unlawful."[113] As explained by the Supreme

Court in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, the antitrust injury doctrine is designed to ensure that "the injury ... reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."[114] The Supreme Court has further explained the requirement as "ensur[ing] that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place," and more specifically, it "ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."[115] Thus, the antitrust injury requirement codifies the well-known motto of the Sherman Act, "The antitrust laws ... were enacted for 'the protection of *competition* not *competitors*.'"[116]

### 2. Clarett Has Antitrust Standing

 Clarett alleges that the NFL's Rule constitutes a "group boycott" that restrains trade in the NFL labor market by erecting a barrier to market entry.[117]

the eligibility for the 2004 draft. That release maintains the Rule excluding players less than three years removed from high school graduation.

**111.** *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341–42, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

**112.** In *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537–45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Supreme Court identified additional factors for lower courts to consider in determining whether a particular plaintiff has standing to bring suit under the antitrust laws. Those factors include: (1) the causal connection between an antitrust violation and the alleged harm suffered by the plaintiff; (2) the nature of the plaintiff's antitrust injury; (3) the directness or remoteness of the asserted injury; (4) the existence of more direct and identifiable victims of the antitrust violation; and (5) the potential for

duplicative recovery or complex apportionment of damages. *See also Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, L.L.P.*, 540 U.S. ——, 124 S.Ct. 872, 884, 157 L.Ed.2d 823 (2004) (Stevens, J., concurring). The NFL does not object to Clarett's antitrust standing, apart from its challenge to his asserted antitrust injury.

**113.** *Brunswick Corp.*, 429 U.S. at 489, 97 S.Ct. 690.

**114.** *Id.*

**115.** *Atlantic Richfield*, 495 U.S. at 342–44, 110 S.Ct. 1884 (emphasis in original).

**116.** *Brunswick Corp.*, 429 U.S. at 488, 97 S.Ct. 690 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)) (emphasis in original).

**117.** *See* Compl. ¶¶ 34–35 ("The Rule is a per se violation of the Sherman Act.... The Rule is a group boycott and a concerted refusal to deal with individuals such as Clarett.").

For reasons discussed in greater detail below, the Rule is a naked restraint on competition for player services because it excludes a class of players from entering the market. It harms competition because some players are simply not permitted to compete.[118] Clarett's injury—his exclusion from the NFL—flows directly from the anticompetitive effects of the Rule, and thus constitutes antitrust injury. Accordingly, Clarett has antitrust standing. Indeed, three courts have reached the merits of almost identical claims that challenged, on antitrust grounds, the validity of restrictions barring younger players from competing for positions in various sports leagues.[119]

### a. The Rule Need Not Affect Price or Output for Clarett to Have an Antitrust Injury

Nonetheless, the NFL argues that Clarett has no antitrust injury, and therefore no standing, because the Rule has no effect on either price (defined as player salary) or output (defined as the number of jobs) in the relevant market. The NFL relies on the Seventh Circuit's decision in *Chicago Professional Sports Ltd. Partnership v. National Basketball Association*, where Judge Easterbrook suggested that "[t]he antitrust injury doctrine ... requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers."[120] The NFL

reasons that the Rule has no effect on price because player salaries are prescribed by the League's salary cap, which teams consistently meet, and does not affect output, because League rules limit the number of roster spots available to each team, which each team consistently fills. Because price and output are therefore relatively static, the NFL concludes that Clarett has no antitrust injury.

Such a rigid "price or output" rule finds little support in the case law. Even within the Seventh Circuit, the validity of the *Chicago Professional Sports* rule is debatable. *First*, the rule itself is plain dicta. As the court conceded at the outset, "[a]ntitrust injury is one subject in particular that *has not* been presented for decision here."[121] *Second*, the Seventh Circuit itself has been inconsistent in addressing the question of whether an impact on consumers (in this case, the NFL teams) via price or output is required to show antitrust injury.

> Whether harm to consumers is the *sine qua non* of antitrust injury is an issue over which there is currently a split in this circuit. Some of our cases hold that a plaintiff, to satisfy the antitrust injury requirement, must demonstrate that the challenged practice causing him harm also harms consumers by reducing output or raising prices. Others hold that application of the antitrust laws does not depend in each particular case upon the ultimate demonstrable consumer effect.[122]

---

**118.** *See infra* Part IV.C.3.a.

**119.** *See Boris v. United States Football League*, No. 83 Civ. 4980, 1984 WL 894 (C.D.Cal. Feb.28, 1984); *Linseman v. World Hockey Ass'n*, 439 F.Supp. 1315 (D.Conn.1977); *Denver Rockets v. All–Pro Management, Inc.*, 325 F.Supp. 1049 (C.D.Cal.1971). Although none of these cases address antitrust injury directly, *Boris* and *Linseman* were decided after *Brunswick*, so both courts presumably satisfied themselves that such an injury existed. Otherwise, the plaintiffs would have lacked standing to bring their antitrust claims.

**120.** 961 F.2d 667, 670 (7th Cir.1992).

**121.** *Id.* at 669 (emphasis added).

**122.** *Banks v. National Collegiate Athletic Ass'n*, 977 F.2d 1081, 1097 (7th Cir.1992) (Flaum, J., concurring in part and dissenting in part) (citations and quotation marks omitted) (comparing *Chicago Prof'l Sports*, 961 F.2d at 670 with *Fishman v. Estate of Wirtz*, 807 F.2d 520, 536 (7th Cir.1986)).

*Third,* application of the "price or output" rule is particularly questionable in the context of labor (as opposed to product) markets. As the just-quoted passage reveals, changes in price or output are measures of the effect on *consumers* of a questioned practice. But in a labor market—where the consumers of labor are also usually the antitrust defendants—it makes little sense to require harm to consumers as a prerequisite for antitrust standing.[123]

There is even less support for a strict "price or output" rule outside of the Seventh Circuit. Indeed, none of the other Courts of Appeals has *ever* endorsed such a test. Rather, the Supreme Court as well as the lower courts have recognized that while allegations of inflated prices or reduced services as a result of a defendant's anticompetitive conduct are among the classic examples of antitrust injury,[124] they are but two of the many ways in which a defendant's anticompetitive conduct can adversely affect the market. As the Ninth Circuit held in *Les Shockley Racing, Inc. v. National Hot Rod Association,* a violation of the Sherman Act is threatened "when the restraining force of an agreement or other arrangement affecting trade becomes unreasonably disruptive of market functions *such as* price setting, resource allocation, market entry, or output designation." [125]

■■■■ In other words, an effect on price or output is a sufficient but not a neces-

sary element of antitrust injury. Antitrust injury may arise from other anticompetitive effects, including barriers to market entry. The Supreme Court has long held that group boycotts are injurious to competition—and thus may give rise to a plaintiff's antitrust injury—when those barriers do *not* affect price or output, or even when they affect price or output in a way that is beneficial to competition:

> Group boycotts ... have long been held to be in the forbidden category. They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they "fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality." Even when they operated to lower prices or temporarily to stimulate competition they were banned.[126]

Clarett alleges a group boycott excluding him, and all others like him, from the market. His exclusion is an injury flowing directly from the anticompetitive effect of the Rule.

### b. Clarett Alleges a Group Boycott, Not Merely That Another Player Has Taken His Place

The NFL conveniently mischaracterizes Clarett's claim as "an allegation that the eligibility rule will enable another player to secure a roster position and compensation that, in plaintiff's view, should be his own." [127] Clarett readily admits that this

---

123. *See id.* at 1098 ("[T]he market at issue here is the college football *labor* market, and the NCAA member colleges are consumers in that market. It would be counterintuitive to require Banks to demonstrate that the no-draft and no-agent rules harm the colleges, the very entities that established those rules. I doubt very strongly that the rule laid out in *Chicago Professional Sports,* to the extent it is valid elsewhere, was intended to apply in this context.") (emphasis in original).

124. *See Associated Gen. Contractors,* 459 U.S. at 538, 103 S.Ct. 897.

125. 884 F.2d 504, 508 (9th Cir.1989) (emphasis added).

126. *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (quoting *Fashion Originators' Guild of Am. v. Federal Trade Comm'n,* 312 U.S. 457, 466, 61 S.Ct. 703, 85 L.Ed. 949 (1941)).

127. Memorandum in Support of the National Football League's Motion for Summary Judgment (Antitrust Injury) ("NFL AI Mem.") at 12.

would not be an antitrust injury.[128] In fact, Clarett is not complaining that he was replaced by other players as a result of competition in a fair and open market. Rather, Clarett alleges that he and other players made ineligible under the Rule have been *foreclosed* from entering the market altogether. "They are not losers in a competitive marketplace; they are not even allowed in the game." [129]

In support of its argument, the NFL relies on cases involving "supplier substitution" rather than exclusion from the relevant market. As such, these cases are inapposite. The only case among those cited by the NFL that binds this Court— the Second Circuit's decision in *Balaklaw v. Lovell* [130]—provides the perfect example. In *Balaklaw*, plaintiff enjoyed a *de facto* exclusive contract to provide anesthesiology services at Cortland Memorial Hospital. That relationship ended when the Hospital decided to solicit proposals for a written exclusive contract. The Hospital reviewed nine proposals including one from Dr. Ba-

laklaw's group and interviewed four of the applicant groups, again including Dr. Balaklaw's, before ultimately awarding the exclusive contract to a group headed by Dr. Delf King. Dr. Balaklaw sued the Hospital, alleging "that the Hospital's and Dr. King's actions in entering into the exclusive anesthesiology contract constituted a conspiracy to engage in an illegal group boycott of, and a concerted refusal to deal with, Dr. Balaklaw." [131] The Second Circuit rejected this claim, holding that "injuries resulting from competition alone are not sufficient to constitute antitrust injuries." [132] Dr. Balaklaw's injury, the court explained, stemmed not from a group boycott, but from competition: "Dr. Balaklaw, like seven of the other eight anesthesiology groups that submitted proposals, simply failed to win the exclusive contract to practice anesthesiology at CMH.... By closing its doors to Dr. Balaklaw *in favor of one of his competitors*, CMH did nothing to inflict an injury of the type the antitrust laws were intended to prevent." [133]

---

**128.** *See* Plaintiff's Memorandum in Opposition to Defendant National Football League's Motion for Summary Judgment (Antitrust Injury) ("Clarett AI Mem.") at 10 ("Defendant asserts that the substitution of one supplier of services for another does not constitute antitrust injury. We agree."); *see also NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 137, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) ("The freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage.").

**129.** Clarett AI Mem. at 10.

**130.** 14 F.3d 793.

**131.** *Id.* at 796.

**132.** *Id.* at 797.

**133.** *Id.* at 801–02 (emphasis added) (footnote omitted). The NFL's reliance on *Mathias v. Daily News, L.P.,* 152 F.Supp.2d 465

(S.D.N.Y.2001), is also misplaced. That case involved a suit by newspaper delivery firms against the Daily News, alleging that when the newspaper started delivering its own papers it "attempted to eliminate competition between itself and the Carriers." *Id.* at 479. As in *Balaklaw*, the court held that defendant's conduct was merely ordinary competition:

> [F]air and vigorous competition necessarily entails success for some and loss or only marginal profit for others—a natural result which never sits well with all of the parties who sacrifice and risk equally to compete in the marketplace. But the antitrust laws require competitors to show more than individual loss or exclusion *resulting from fair and vigorous competition.* Here, the Carriers fail to allege any facts that point to a demonstrable impact on the market. Therefore, because of their failure to plead antitrust injury, the Carriers' [antitrust] causes of action are dismissed.

*Id.* at 480 (emphasis added).

In contrast to *Balaklaw*, the Rule precludes Clarett from entering into "fair and vigorous competition." Clarett does not merely allege, as plaintiffs in *Balaklaw* did, that he was harmed *by* competition. Rather, the harm to Clarett—his exclusion from the League—flows from a harm *to* competition.

The NFL's reliance on two other cases—the Ninth Circuit's decision in *Les Shockley Racing*[134] and the Sixth Circuit's decision in *National Hockey League Players' Association ("NHLPA") v. Plymouth Whalers Hockey Club*[135]—is equally unavailing. Those cases deal with the merits of the plaintiffs' respective antitrust claims, not antitrust standing. Indeed, the *Les Shockley* court even went out of its way to explain that it was *not* addressing antitrust injury: "[W]hether plaintiffs would meet the five-factor standing test of *Associated Gen. Contractors* is irrelevant to this appeal."[136]

To the extent that those two cases have *any* bearing on Clarett's case—because they concern the exclusion of potential competitors in the sports context—they are easily distinguished. The plaintiffs in *Les Shockley Racing* were owners and operators of jet-powered trucks and motorcycles who staged exhibition drag races. The National Hot Rod Association ("NHRA") banned exhibition drag racing of jet-powered motorcycles and trucks on tracks under their sponsorship or control. Plaintiffs claimed that this ban violated section 1 of the Sherman Act by restraining trade in the market for "exhibition drag racing services."[137] Plaintiffs further alleged that because the NHRA controlled the majority of drag racing tracks, plaintiffs were effectively blocked from the relevant market. In affirming dismissal of the complaint, the court held that plaintiffs had failed to allege that their exclusion resulted in a "reduction of competition in the market in general" as opposed to "injury to their own position as competitors in the market."[138] The court went on to provide examples of what was lacking:

> Absent are factual allegations outlining the effect of the NHRA's ban on the price or availability of exhibition drag racing services in the United States; the allocation of work hours, vehicle parts, and other resources crucial to the provision of those services; the availability of opportunity for entry into the market through the use of jet-powered vehicles other than trucks or motorcycles; or any other characteristic or function of a competitive market.[139]

Clarett's case is starkly different. Clarett defines the relevant market as the NFL labor market for player services. He specifically pleads a complete barrier to market entry. "The Rule is harmful to competition as it provides for *total* exclusion of players who have not completed three college seasons or are not three years removed from high school graduation, *notwithstanding their ability to perform in the market and compete for available positions in the league.*"[140] Clarett also specifically alleges that "[t]here is no

---

**134.** 884 F.2d 504.

**135.** 325 F.3d 712 (6th Cir.2003).

**136.** 884 F.2d at 509 n. 1 (noting that the court was specifically declining to address antitrust standing because "[b]y holding that injury to competition was inadequately pleaded, the district court determined that *no violation of the antitrust law was stated.* Thus, no party could sue on the basis of the allegations in the amended complaint.") (emphasis added).

**137.** 884 F.2d at 508.

**138.** *Id.*

**139.** *Id.* at 509.

**140.** Compl. ¶ 38.

other league of professional football that is comparable to the NFL." [141]

The market defined by Clarett is narrow—it is the market for NFL player services. That is the only commodity that Clarett has to sell and the only commodity the NFL seeks to buy. Accordingly, the Rule harms both Clarett and competition in the market for player services. A purchaser's bar on an entire class of sellers harms competition in the absence of an alternative comparable buyer. [142] By contrast, the market in *Les Shockley* was the market for all exhibition drag racing. While jet-powered trucks and motorcycles were excluded from that market, plaintiffs were not. They could have competed by offering to exhibit other jet-powered vehicles or non jet-powered trucks and motorcycles. Indeed, this point was explicitly acknowledged by the *Les Shockley* court. "[W]hen the restraining force of the agreement or other arrangement affecting trade becomes *unreasonably* disruptive of market functions such as ... market entry ... a violation of the Sherman Act [is] threatened." [143]

Similarly, plaintiffs' claims in *NHLPA* were dismissed because the plaintiffs did not identify a market in which competition was impaired: "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim. Appellees do not define a relevant market in their complaint...." [144] Thus, the court ruled that plaintiffs had failed to demonstrate a required *element* of a section 1 claim: injury to competition within a definable market. This failure was critical because the ill-defined market made it impossible to gauge whether other comparable leagues were unavailable to the plaintiffs such that competition was harmed.

While at first glance the age-based ban on athletes at issue in *NHLPA* may appear similar to the Rule, that facial similarity is misleading. Because the NFL is not comparable to other professional football leagues, the contours of the market identified by Clarett are clear. In *NHLPA,* plaintiffs identified a *product* market for amateur hockey, *i.e.,* a market where the Ontario Hockey League was the seller of amateur hockey to its fans. Thus, the *NHLPA* plaintiffs alleged harm to the spectators who were deprived of the opportunity to see the best players. It is not surprising that the court found no anticompetitive effects in that market from the alleged age-based eligibility restriction. Such a rule could have affected the product of amateur hockey only by diminishing the quality of play—a concern of no relevance under the antitrust laws. [145] Clarett, by contrast, seeks to sell *his* services in a *labor* market. Thus, the harm he alleges is to the market of players selling their services, not to the market of consumers viewing the players. [146]

*Intellective, Inc. v. Massachusetts Mutual Life Insurance Co.* [147] demonstrates that unreasonable barriers to market entry—*i.e.,* group boycotts—are sufficient to establish antitrust injury. In *Intellective,* a consortium of life insurers known as the "Working Group" entered into an agreement to withhold historical data (such as might be used in preparing a comparative analysis of the insurers' investment management practices or asset allocation strat-

---

141. *Id.* ¶ 30.

142. *See infra* Part IV.C.3.a.

143. 884 F.2d at 508.

144. 325 F.3d at 719–20 (quotation marks and citations omitted) (emphasis added).

145. *See id.* at 720.

146. *See infra* Part IV.C.3.a.

147. 190 F.Supp.2d 600 (S.D.N.Y.2002).

egies) from third parties that might wish to prepare such studies.[148] Intellective, a consulting firm that was not affiliated with the Working Group, alleged that this arrangement violated section 1 by erecting " 'tremendous barriers of entry for anyone who wishes to compete' because '[a]ny investment performance survey which does not include data from the Working Group companies will be much less valuable than one that does.' " [149]

Defendants argued that Intellective had not sustained an antitrust injury because it was merely complaining that it had lost its job preparing comparative studies to the Working Groups' preferred consultants.[150] The court concluded that, "[t]o the extent Intellective claims injury relating to its loss of the [ ] contract, defendants are correct that Intellective has not pleaded an adequate antitrust injury. Intellective lost the [ ] contract to Sagamore [a competing firm] through competition between the two." [151] But the court also found that the Working Groups' systematic exclusion of other firms—Intellective or anyone else—from entering the market for producing comparative life insurance investment reports constituted a legitimate antitrust injury:

Defendants mistake Intellective's primary complaint. Although Intellective does complain of the Insurance Company Defendants' decision not to award the contract to Intellective, Intellective's principal claim stems from the Working Group's attempt to monopolize the information necessary to compete in the relevant market. *Intellective adequately states an antitrust injury in this regard.* Intellective alleges that it, and all others, are prevented from competing in the relevant market by the Working Group's control of the data necessary to perform a competing study. *The prevention of this type of marketwide competition is an "injury of the type the antitrust laws were designed to prevent."* Further, Intellective's own injury—its inability to compete in this market—stems from defendants' activities, as required under *Atlantic Richfield*.[152]

Clarett has a demonstrable antitrust injury for precisely the same reason: he alleges that the Rule prevents him, and all others similarly situated, from competing in the relevant market. And Clarett's own injury—his inability to compete in the market—stems from defendant's activities.[153] Thus, he has demonstrated anti-

---

148. *See id.* at 605 ("Once a company signs on to participate ... that company can never give the same historical investment performance data to any other consultant. In other words ... the Working Group has locked up the information necessary to perform competing studies.").

149. *Id.* at 606 (quoting the complaint; alteration in original).

150. *See id.* at 613.

151. *Id.*

152. *Id.* (emphases added) (footnote omitted) (quoting *Brunswick*, 429 U.S. at 489, 97 S.Ct. 690).

153. The NFL attempts to distinguish *Intellective* on two grounds, neither of which is persuasive. *First*, it argues that *Intellective* arose in the context of a motion to dismiss. While that is true, it in no way affects the court's analysis. In *Intellective*, the complaint alleged that the Working Group withheld the relevant data from all competitors, shutting them out of the market. In this case, it is undisputed that the Rule prohibits underclassmen from entering the market. The fact that the court in *Intellective* was required to accept the complaint's allegations is a distinction without a difference. The court was not required, as the NFL suggests, to accept as true plaintiff's *legal* conclusion that it had an antitrust injury.

The NFL also perseverates over the fact that the exclusion in *Intellective* was "permanent," 190 F.Supp.2d at 616, whereas the Rule only forbids players from entering the

trust injury.

## C. The Rule Is an Unreasonable Restraint of Trade

### 1. The Sherman Act Forbids Unreasonable Restraints of Trade

Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade."[154] Although the plain language of the Sherman Act would suggest that *every* contract in restraint of trade violates the antitrust laws, the Supreme Court has long held that the Sherman Act prohibits only "unreasonable" restraints of trade.[155] Thus, in order to prevail, "a plaintiff claiming a § 1 violation must first establish a combination or some form of concerted action between at least two legally distinct economic entities.... [I]t must then proceed to demonstrate that the agreement constituted an unreasonable restraint of trade...."[156] It is undisputed that the Rule is the product of concerted action amongst the NFL teams. The only issue that remains is whether the Rule is an unreasonable restraint of trade.

To determine whether a restraint of trade is unreasonable, most antitrust claims are analyzed according to the "rule of reason." This rule requires analysis of various factors including information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect.[157] Some types of restraints, however, have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se* and no further inquiry is required.[158] *Per se* treatment is appropriate "[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it."[159] The *per se* rule is used when courts are confronted with conduct that experience teaches is overwhelmingly likely to be anticompetitive; in such cases there is no need for a detailed market analysis.[160] "Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are [horizontal] price

NFL temporarily, deferring their entry for a number of years. While this is true, that fact played no role whatsoever in the court's decision. In any case, whether Clarett's exclusion is temporary or permanent goes to the *extent* of his antitrust injury, not the existence of that injury.

154. 15 U.S.C. § 1.

155. *See United States v. Joint–Traffic Ass'n,* 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898); *see also State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); *Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 342–43, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).

156. *Capital Imaging,* 996 F.2d at 542.

157. *See Maricopa County,* 457 U.S. at 343 and n. 13, 102 S.Ct. 2466.

158. *See Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

159. *Maricopa County,* 457 U.S. at 344, 102 S.Ct. 2466; *see also Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (a *per se* rule is applied when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output").

160. *See National Collegiate Athletic Ass'n ("NCAA") v. Bd. of Regents of University of Oklahoma,* 468 U.S. 85, 104, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("[w]hether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition. Under the Sherman Act the criterion to be used in judging the validity of a restraint on trade is its impact on competition.").

fixing, division of markets, group boycotts, and tying arrangements." [161]

### 2. The Validity of the Rule Must Be Analyzed Under the Rule of Reason

In *NCAA v. Board of Regents*, the Supreme Court modified the *per se* approach for industries in which some horizontal restraints are necessary. In such industries, even conduct that is normally condemned as *per se* unreasonable must be evaluated under the rule of reason in order to take into account the realities of the industry's regulatory landscape. As one scholar explained,

> [S]ome activities can only be carried out jointly. Perhaps the leading example is league sports. When a league of professional lacrosse teams is formed, it would be pointless to declare their cooperation illegal on the ground that there are no other professional lacrosse teams. [162]

Thus, in *NCAA*, the Court held that while [h]orizontal price fixing and output limitation are ordinarily condemned as a matter of law under an "illegal *per se*" approach because the probability that these practices are anticompetitive is so high ... we have decided that it would be inappropriate to apply a *per se* rule

to this case ... [because] this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all. [163]

Here, notwithstanding the fact that Clarett alleges that the Rule constitutes a group boycott—conduct that historically falls into the *per se* category [164]—the parties agree that the rule of reason applies because the challenged restraint arises in the context of a sports league.

### 3. Application of the Rule of Reason

▉▉▉▉ In evaluating a rule of reason case on summary judgment, courts employ a three step burden-shifting test.

Under this test plaintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market.... After the plaintiff satisfies its threshold burden of proof under the rule of reason, the burden shifts to the defendant to offer evidence of the procompetitive "redeeming virtues" of their combination. Assuming defendant comes forward with such proof, the burden shifts back to plaintiff for it to demonstrate that any legitimate collaborative objectives proffered by defendant

**161.** *Northern Pacific*, 356 U.S. at 5, 78 S.Ct. 514 (citing cases).

**162.** Robert H. Bork, *The Antitrust Paradox* 278 (1978) (quoted in *NCAA*, 468 U.S. at 101, 104 S.Ct. 2948).

**163.** *NCAA*, 468 U.S. at 100–01, 104 S.Ct. 2948; *see also VKK Corp. v. National Football League*, 244 F.3d 114, 131 (2d Cir.2001) ("While some restraints of trade are illegal per se, others, such as trade restrictions by sports leagues, are analyzed to determine whether the restriction's 'harm to competition outweighs any procompetitive effects.'") (quoting *St. Louis Convention & Visitors Comm'n v. National Football League*, 154 F.3d 851, 861 (8th Cir.1998)).

**164.** Even if this case did not arise in the sports context, the rule of reason might have applied. The Supreme Court has signaled its intent to move group boycotts off the short list of *per se* unreasonable conduct. *Compare Klor's*, 359 U.S. at 212, 79 S.Ct. 705, *with Federal Trade Comm'n v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458–59, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), *and Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). *See generally Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir.1999) ("Generally, group boycotts are illegal *per se*. Not all such boycotts, however, are *per se* violations. The scope of the *per se* rule against group boycotts is a recognized source of confusion in antitrust law.") (citations omitted).

could have been achieved by less restrictive alternatives, that is, those that would be less prejudicial to competition as a whole.[165]

### a. The Rule Is a Naked Restraint of Trade

Clarett alleges that the Rule constitutes a "group boycott" that restrains trade in the relevant market (the NFL player market) by denying market entry to certain sellers (players less than three years removed from high school graduation). This is precisely the sort of conduct that the antitrust laws were designed to prevent: "whatever other conduct the Acts may forbid, they certainly forbid all restraints of trade which were unlawful at common-law, and one of the oldest and best established of these is a contract which unreasonably forbids any one to practice his calling." [166]

Courts have found that similar entry barriers violate the antitrust laws. In *Denver Rockets v. All–Pro Management, Inc.*[167]—the so-called "Spencer Haywood" case—the court considered an NBA bylaw that restricted eligibility to players who were at least four years removed from the date of their high school graduation (or, in the case of players who did not graduate high school, from the date of the remainder of their class's high school graduation). Holding that the four-year rule constituted an unreasonable restraint of trade, the court explained:

Application of the four-year college rule constitutes a "primary" concerted refusal to deal wherein the actors at one level of a trade pattern (NBA team members) refuse to deal with an actor at another level (those ineligible under the NBA's four-year college rule).

The harm resulting from a "primary" boycott such as this is threefold. First, the victim of the boycott is injured by being excluded from the market he seeks to enter. Second, competition in the market in which the victim attempts to sell his services is injured. Third, by pooling their economic power, the individual members of the NBA have, in effect, established their own private government. Of course, this is true only where the members of the combination possess market power in a degree approaching a shared monopoly. This is uncontested in the present case.[168]

Similar age-based restrictions have been struck down in the context of professional hockey[169] and professional football.[170] Although all of these cases were decided prior to *NCAA*—and thus employed a *per se* analysis—their economic analysis remains sound. Age-based eligibility restrictions in professional sports are anticompetitive because they limit competition in the player personnel market by excluding sellers.

---

165. *Capital Imaging*, 996 F.2d at 543 (citations omitted) (quoting 7 Areeda & Hovenkamp, *Antitrust Law* ¶ 1502).

166. *Gardella*, 172 F.2d at 408.

167. 325 F.Supp. 1049.

168. *Id.* at 1061.

169. *See Linseman*, 439 F.Supp. at 1320 (preliminarily enjoining a rule declaring players younger than twenty ineligible for hockey league draft because it was an illegal "group

boycott, or a concerted refusal to deal, [that] has been long and consistently classified as a *per se* violation of the Sherman Act.").

170. *See Boris*, 1984 WL 894, at *1 (preliminarily enjoining, as an illegal group boycott, a rule providing that "[n]o person shall be eligible to play ... unless (1) all college football eligibility of such player has expired, or (2) at least five (5) years shall have elapsed since the player first entered or attended a recognized junior college, college or university or (3) such player received a diploma from a recognized college or university").

Nonetheless, the NFL argues that Clarett has failed to establish a prima facie claim under section 1 because he has not "establish[ed] the contours of the relevant market."[171] This argument fails for two reasons, one factual and one legal. *First,* Clarett has sufficiently defined the relevant market. In his complaint, Clarett alleges that "[t]he NFL is a distinct market for professional football for which there are no reasonable substitutes in the United States."[172] The relevant market is therefore the market for NFL players.[173] That the League has exclusive market power in this arena is obvious; the very fact that it can establish a Rule that excludes players from the market altogether demonstrates its market domination.

■ *Second,* as a legal matter, the NFL's argument that Clarett has failed to define the relevant market "misapprehends the purpose in antitrust law of market definition, which is not an end unto itself but rather exists to illuminate a practice's effect on competition."[174] As the Tenth Circuit has explained, "A plaintiff may establish anticompetitive effect indirectly by proving that the defendant possessed the requisite market power within a defined market or directly by showing actual anticompetitive effects...."[175]

"To avoid examining the relevant market, market power, and anticompetitive effect in all cases in which conduct does not clearly fit within a *per se* category, the Supreme Court has sanctioned an intermediate inquiry, known as 'quick look,' if the conduct at issue is a 'naked restriction.'"[176] Such a "quick look" analysis, as the Supreme Court has recently explained, is appropriate where "the great likelihood of anticompetitive effects can easily be as-

**171.** *See* NFL Mem. at 20 (quoting *Union Carbide Corp. v. Montell N.V.,* 28 F.Supp.2d 833, 840 (S.D.N.Y.1998)).

**172.** Compl. ¶ 8.

**173.** The League's suggestion that one of the other professional football leagues in North America is a fair substitute for the NFL cannot be taken seriously. "[M]arket definition is guided by an analysis of the interchangeability of use or the cross-elasticity of demand for potential substitute products." *Todd v. Exxon Corp.,* 275 F.3d 191, 201 (2d Cir.2001) (quotation marks and citations omitted). In the case of a labor market or buyer-side conspiracy, these factors are reversed. "In such a case, the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes." *Id.* at 202 (quotation marks and citations omitted). No elaborate factual record need be developed to recognize that no football player would see the Arena League or the Canadian League as a reasonably good substitute for the NFL.

**174.** *Law v. Nat'l Collegiate Athletic Ass'n,* 134 F.3d 1010, 1020 (10th Cir.1998).

**175.** *Id.* at 1019.

**176.** *Bogan,* 166 F.3d at 514 n. 6.; *see also Capital Imaging,* 996 F.2d at 546 (holding that "the plaintiff may satisfy [its] burden without detailed market analysis by offering proof of actual detrimental effects" to demonstrate "that the defendants' conduct or policy has had a substantially harmful effect on competition"); *Law,* 134 F.3d at 1020 ("[W]here a practice has obvious anticompetitive effects ... there is no need to prove that the defendant possesses market power. Rather, the court is justified in proceeding directly to the question of whether the procompetitive justifications advanced for the restraint outweigh the anticompetitive effects under a 'quick look' rule of reason."); *see generally California Dental Ass'n v. Federal Trade Comm'n,* 526 U.S. 756, 779, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999) ("The truth is that our categories of analysis of anticompetitive effect are less fixed than terms like '*per se,*' 'quick look,' and 'rule of reason' tend to make them appear. We have recognized, for example, that there is often no bright line separating *per se* from Rule of Reason analysis, since considerable inquiry into market conditions may be required before the application of any so-called *per se* condemnation is justified.") (quotation marks omitted).

certained," and "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect."[177]

The Rule is the perfect example of a policy that is appropriately analyzed under the "quick look" standard because its anticompetitive effects are so obvious. Indeed, one can scarcely think of a more blatantly anticompetitive policy than one that excludes certain competitors from the market altogether. Because the Rule has the actual anticompetitive effect of excluding players—including Clarett—from the NFL, it is a naked restriction.[178] Clarett has therefore established a prima facie violation of section 1 of the Sherman Act.

### b. The Rule Has No Legitimate Procompetitive Justification

Because Clarett has established the anticompetitive effect of the Rule, the burden shifts to the NFL to offer a procompetitive justification.[179] The NFL offers four justifications:

> The purposes of the eligibility rule include [1] protecting younger and/or less experienced players—that is, players who are less mature physically and psy-

chologically—from heightened risks of injury in NFL games; [2] protecting the NFL's entertainment product from the adverse consequences associated with such injuries; [3] protecting the NFL clubs from the costs and potential liability entailed by such injuries; and [4] protecting from injury and self-abuse other adolescents who would over-train—and use steroids—in the misguided hope of developing prematurely the strength and speed required to play in the NFL.[180]

While these may be reasonable *concerns*, none are reasonable *justifications* under the antitrust laws.[181]

The NFL's first and fourth justifications—the desire to protect younger athletes from injury or over-training—can be dismissed out of hand. The antitrust laws require a *procompetitive* justification in the face of a demonstrably anticompetitive rule.[182] The NFL's concern for the health of younger players is laudable, but it has nothing to do with promoting competition.

The NFL's second and third justifications—the desire to protect the League and its teams from the costs associated with injuries—are, for two reasons, also ineffective. *First*, the League may not

---

177. *California Dental*, 526 U.S. at 770, 119 S.Ct. 1604.

178. *See* 13 Areeda & Hovenkamp, *Antitrust Law* ¶ 2201a ("A concerted refusal to deal is 'naked' if its objectively intended purpose is to keep the target's output off the market....").

179. *See id.* at 788, 119 S.Ct. 1604 (Breyer, J., concurring in part and dissenting in part) ("In the usual Sherman Act § 1 case, the defendant bears the burden of establishing a procompetitive justification.").

180. NFL Mem. at 4.

181. Clarett argues that the real motivation for the Rule is that it creates a free farm system— a risk-free laboratory for the development of

younger players. *See, e.g.,* Clarett AI Mem. at 3 ("[T]he teams' agreement perpetuates and maintains the NCAA as its free minor league system."). When a collegiate player is injured or simply fizzles out, Clarett charges, it happens on someone else's (usually the player's) dime. Whether Clarett is right or wrong in his speculation is irrelevant to deciding whether the Rule violates the antitrust laws. The question here is whether the party who has restrained competition can offer a legitimate procompetitive justification for that action.

182. *See Law*, 134 F.3d at 1021 ("Justifications offered under the rule of reason may be considered only to the extent that they tend to show that, on balance, 'the challenged restraint enhances competition.'") (quoting *NCAA*, 468 U.S. at 104, 104 S.Ct. 2948).

justify the anticompetitive effects of a policy by arguing that it has procompetitive effects *in a different market*.[183] Yet this is precisely what the NFL is advocating. The League argues that the Rule, by allegedly limiting the occurrence of player injuries, maintains the high quality of its "entertainment product," and thus presumably enables the League to better compete with other providers of sports entertainment such as other professional sports leagues or amateur football. The Rule, according to the NFL, thus limits competition in the player personnel market but enhances competition in the market for sports entertainment.[184] Even if it could be said with certainty that the Rule is procompetitive in this sense—and the League has certainly submitted no evidence to that effect—the League may not enact a policy that, effectively, "determine[s] the respective values of competition in various sectors of the economy." [185]

*Second,* the NFL's desire to keep its costs down is not a legitimate procompeti-

tive justification.[186] The fact that the League and its teams will save money by excluding players does not justify that exclusion. Indeed, the vast majority of anticompetitive policies are instituted because they will be profitable to the violators. As one scholar explains,

> The exercise of market power by a group of buyers virtually always results in lower costs to the buyers—a consequence which arguably is beneficial to the members of the industry and ultimately their consumers. If holding down costs by the exercise of market power over suppliers, rather than just by increased efficiency, is a procompetitive effect justifying joint conduct, then section 1 can never apply to input markets or buyer cartels. That is not and cannot be the law.[187]

Because the League has failed to offer *any* legitimate procompetitive justifications for the Rule, Clarett must prevail.[188] There is no need to proceed to trial or engage in fact-finding because the League has failed,

183. *See United States v. Topco Assocs., Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) ("[T]he freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster. Implicit in such freedom is the notion that it cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy.").

184. The NFL's reference to "protecting the NFL's entertainment product" is somewhat obscure. The NFL never explains how protecting its entertainment product enhances competition.

185. *Topco,* 405 U.S. at 610–11, 92 S.Ct. 1126. A fifth potential justification for the Rule—alluded to only obliquely in the League's papers—is that the Rule, by excluding the most talented college players from the NFL, "sustains the NCAA's ability to compete in the

entertainment market." Reply Memorandum in Support of the National Football League's Motion for Summary Judgment (Antitrust Injury) at 7, n. 7. That justification fails for the same reason just discussed, namely, that it sacrifices competition in one market for the sake of increased competition in another.

186. *See Law,* 134 F.3d at 1022 ("[C]ost-cutting by itself is not a valid procompetitive justification.").

187. Gary R. Roberts, *The NCAA, Antitrust, and Consumer Welfare,* 70 Tul. L.Rev. 2631, 2643 (1996).

188. *See Chicago Prof'l Sports,* 961 F.2d at 674 (holding that when a plaintiff has demonstrated a naked restraint on trade, "[u]nless there are sound justifications, the court condemns the practice without ado."); *see generally* Phillip Areeda, *The "Rule of Reason" in Antitrust Analysis: General Issues* 37–38 (1981) ("[T]he rule of reason can sometimes be applied in the twinkling of an eye.") (quoted in *NCAA,* 468 U.S. at 110 n. 39, 104 S.Ct. 2948).

as a matter of law, to offer any procompetitive justifications for the Rule. Accordingly, no jury is required to find that the anticompetitive effects of the Rule outweigh its procompetitive benefits.[189]

### c. Less Restrictive Alternatives to the Rule Exist

Nonetheless, even if a procompetitive justification for the Rule existed, summary judgment for Clarett would be appropriate because an alternative to the Rule exists that is less prejudicial to competition. The antitrust laws do not tolerate a policy that restrains trade—even if there is some procompetitive benefit—when a policy that results in less prejudice to competition would be equally effective.[190]

All of the League's justifications for the Rule boil down to the same basic concern: younger players are not physically or mentally ready to play in the NFL. But as the NFL's own affiant concedes, the "timeframe" for a player's physical and psychological maturation "varies from individual to individual." [191] That being so, age is obviously a poor proxy for NFL-readiness, as is a restriction based solely on height or weight.[192] Medical examinations and tests are available to measure an individual player's maturity.[193] The League could easily use those tests to screen out players who are not prepared to play in the NFL. And while Dr. Metzl asserts that such tests are "intrusive," [194] there is little doubt that potential draftees would voluntarily submit to testing in order to compete for a spot in the League.[195]

By requiring draft prospects to submit to these examinations, the League could provide valuable information about player maturity to its teams and allow them to decide whether a prospect is worth selecting. In such a scenario, no player would be automatically excluded from the market and each team could decide what level of risk it is willing to tolerate. The fact that there is a less restrictive alternative only underscores that there is no procompetitive justification for the Rule, and that it violates the antitrust laws.

## V. CONCLUSION

For the reasons just explained, Clarett's motion for summary judgment is granted and the NFL's motions are denied. Because the Rule violates the antitrust laws,

189. *See, e.g., Law,* 134 F.3d 1010 (affirming grant of summary judgment to antitrust plaintiff); *PSC Inc. v. Symbol Tech., Inc.,* 26 F.Supp.2d 505 (W.D.N.Y.1998) (granting summary judgment to antitrust plaintiff); *cf. Capital Imaging,* 996 F.2d 537 (affirming grant of summary judgment to defendant after engaging in rule of reason analysis); *see generally Barry v. Blue Cross of Cal.,* 805 F.2d 866, 871 (9th Cir.1986) ("Occasionally, conduct is so clearly either reasonable or unreasonable that a court can dispose of the issue on summary judgment."); *PSC,* 26 F.Supp.2d at 511 ("Application of the rule of reason is 'often erroneously assumed to require refined fact finding and balancing[,] ... [and] some rule-of-reason cases can be disposed of merely on the basis of the parties' arguments and, more often, on the basis of a limited summary judgment record.' ") (quoting 7 Areeda & Hovenkamp, *Antitrust Law* § 1508) (alteration in original).

190. *See Capital Imaging,* 996 F.2d at 543.

191. Metzl Decl. ¶ 6.

192. *See id.* ¶ 12.

193. *See id.* ¶ 17.

194. *See id.*

195. Indeed, it has been noted that potential draft picks are already subjected to extensive physical, medical and psychological testing. Each of the players that attend the NFL's annual draft combines—where prospective draftees are evaluated by the teams—are subjected to a battery of physical examinations, psychological profiles, and interviews. *See* Vic Carucci, *Combine Still Critical to Evaluating Talent* (Feb. 18, 2003), *at* http://www.nfl.com/draft/story/6197027.

it cannot preclude Clarett's eligibility for the 2004 NFL draft. Accordingly, it is hereby ORDERED that Clarett is eligible to participate in the 2004 NFL draft. Clarett also requests damages as a result of his exclusion from the 2003 NFL draft. Because the parties have not yet addressed this issue, it is unclear whether there are material issues of fact with respect to damages. A conference is scheduled in Courtroom 15C on February 12, 2004 at 10:00 a.m.

SO ORDERED.